62 Cal.Rptr.3d 284 (2007)
152 Cal.App.4th 1254
James BENSON, Plaintiff and Appellant,
v.
KWIKSET CORPORATION et al., Defendants and Appellants.
No. G030956.
Court of Appeal of California, Fourth District, Division Three.
June 29, 2007.
As modified on denial of rehearing July 26, 2007.
*288 Lerach Coughlin Stoia Geller Rudman & Robbins, Pamela M. Parker, Kevin Green; *289 Cuneo Gilbert & LaDuca, Jonathan W. Cuneo, Michael G. Lenett; Soltan and Associates and Venus, for Plaintiff and Appellant.
Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant Attorney General, Herschel T. Elkins, Assistant Attorney General, Ronald A. Reiter and Benjamin G. Diehl, Deputy Attorneys General, for California Attorney General as Amicus Curiae on behalf of Plaintiff and Appellant.
Jones, Bell, Abbott, Fleming & Fitzgerald, Michael J. Abbott, Fredrick A. Rafeedie and William M. Turner, Los Angeles, for Defendants and Appellants and for Amicus Curiae Leatherman Tool Group, Inc. on behalf of Defendants and Appellants.

OPINION
RYLAARSDAM, Acting P.J.

INTRODUCTION
In 2000, plaintiff James Benson, on behalf of the general public, sued defendants Kwikset Corporation, its parent corporation, Black & Decker Corporation (collectively defendants), plus Technolock, S.A. de C.V. (Technolock) for restitution and injunctive relief under the unfair competition law (Bus. & Prof.Code, § 17200) and the false advertising law (Bus. & Prof. Code, § 17500; section 17500; all further statutory references are to the Business and Professions Code unless otherwise indicated). Plaintiff alleged defendants violated statutory provisions prohibiting the marketing or sale of merchandise with "Made in U.S.A." or similar labels when the merchandise either contained foreign-made parts or involved foreign manufacture.
After a December 2001 trial, the superior court found defendants had marketed products in packaging that contained misleading country of origin labels. The trial court entered a judgment for plaintiff enjoining defendants' use of inaccurate labels, and also ordering them to allow retailers and distributors to return mislabeled products for either a refund or replacement. As to Technolock, the court entered judgment in its favor. Thereafter, the court entered an order awarding plaintiff the statutorily authorized costs, plus his attorney fees under Code of Civil Procedure section 1021.5. But the court denied plaintiffs request to include in the fee award certain other litigation expenses that could not be recovered as costs. The court awarded Technolock its costs.
Both parties filed appeals. Defendants' appeal from the judgment challenges the constitutionality and applicability of section 17533.7, which makes it unlawful "to sell or offer for sale ... any merchandise on which ... there appears the words `Made in U.S.A.' ... or similar words when the merchandise or any article, unit, or part thereof, has been entirely or substantially made, manufactured, or produced outside of the United States." They also attack the trial court's interpretation of Civil Code section 1770, subdivision (a)(4) (1770(a)(4)), which declares the use of "deceptive representations ... of geographic origin in connection with goods and services" as unlawful. Defendants additionally contend plaintiff failed to present legally adequate extrinsic evidence to establish their labels were likely to mislead the reasonable consumer.
For his part, plaintiff appeals from both the judgment and postjudgment order. On the judgment, he attacks the trial court's declaration that the Federal Trade Commission Act (15 U.S.C. § 45 et seq.) cannot serve as a predicate statute for an unfair competition law claim, and the extent of the restitutionary relief awarded by the trial court. As for the postjudgment costs order, plaintiff argues the trial court *290 erred both in awarding Technolock costs and in denying an award of his own out-of-pocket litigation expenses that were not recoverable as costs.
In our original opinion, filed June 30, 2004, we rejected both parties' claims and affirmed the judgment and the postjudgment order. But after issuing that opinion, we granted a rehearing on our own motion to further consider the question of whether Code of Civil Procedure section 1021.5 may be construed to authorize recovery' of expenses other than the prevailing party's attorney fees.
While the matter was still pending before us, on November 2, 2004, the electorate approved Proposition 64. This ballot proposition amended both the unfair competition law and the false advertising law in two respects relevant to this case. First, Proposition 64 amended sections 17204 and 17535 to require a private plaintiff seeking to maintain an action for in junctive or restitutionary relief to establish he or she "has suffered injury in fact and has lost money or property." (Prop. 64, §§ 3 & 5.) Second, the ballot proposition amended sections 17203 and 17535 to prohibit a private plaintiff from maintaining the lawsuit as a representative action unless it both satisfies the foregoing standing requirement and "complies with Section 382 of the Code of Civil Procedure. (Prop. 64, §§ 2 & 5.)
Defendants then filed a motion seeking to vacate the trial court's judgment and enter an order dismissing the action on the ground Proposition 64 eliminated the statutory authority for plaintiff to maintain this action. In our opinion filed February 10, 2005, we concluded the amendments implemented by Proposition 64 applied to this action and ordered the judgment and postjudgment order vacated. However, because plaintiff asserted he can satisfy the ballot proposition's new requirements, we remanded the case to the superior court with directions to afford plaintiff an opportunity to amend his complaint to allege facts establishing he has standing and is able to comply with Code of Civil Procedure section 382.
Both parties filed petitions for review and on April 27, 2005, our Supreme Court filed its order granting plaintiffs petition and denying defendant's. Further action was "deferred pending consideration and disposition of a related issue in Californians For Disability Rights v. Mervyn's LLC [(2006) 39 Cal.4th 223, 46 Cal. Rptr.3d 57, 138 P.3d 207]...." On April 23, 2007, the Supreme Court issued its order transferring the matter to this court "with directions to vacate its decision and to reconsider the cause in light of Branick v. Downey Savings & Loan Assn. (2006) 39 Cal.4th 235, 46 Cal.Rptr.3d 66, 138 P.3d 214" (Branick).
We have received additional briefs from the parties wherein plaintiff urges that, in light of Branick, we "remand this matter to the trial court to (a) conduct further proceedings limited to the issue of standing under Proposition 64, and (b) reenter its original judgment if the standing requirements under Proposition 64 are met." Defendant, in its supplemental brief, does not argue to the contrary.
In accordance with Branick, we will remand the case to the trial court to consider whether plaintiff should be permitted to amend the complaint to plead facts satisfying the standing requirements under the revised statute. If so, the trial court shall conduct further proceedings limited to a determination of whether plaintiff can prove he has standing and can maintain this lawsuit as a representative action. In the event plaintiff does so successfully, the original judgment shall be reimposed and the balance of our opinion shall stand as *291 resolution of the issues previously raised by the parties.

FACTUAL AND PROCEDURAL BACKGROUND
Kwikset manufactures and sells hardware described as locksets, which can include deadbolts, doorknob sets, door lever sets, and door handle sets. It has several plants located throughout the United States, plus one in Mexico. Between 1996 and 2000, Kwikset manufactured and sold 35 different varieties of locksets. Plaintiff presented evidence that defendants' attached labels to these products stating "Made in U.S.A.," "All American Made," or making similar representations. However, some of these products included screws and pins made in Taiwan, a latch assembly that was sub-assembled at defendants' Mexico plant, or both foreign made parts and assembly.
Plaintiff testified a product label stating "Made in the USA" meant to him "that whatever is in that package should be madethe parts, labor, and the whole component should be made in [the] USA." He purchased Kwikset products "[b]ecause they had a reputation for being ... quality product[s], and I was aware they were made in the USA" Based on what he subsequently learned about the manufacture of Kwikset's products, he did not believe its country of origin labels were honest.
Plaintiff also called two other witnesses who had purchased Kwikset products. Both witnesses testified a "Made in U.S.A" or similar label was an important factor in their purchasing decision, they interpreted the label to mean all of the parts and all of the labor used to manufacture the product occurred here, and felt they had been deceived by the country of origin labels on Kwikset's products.
After plaintiff filed this action, Kwikset decided to stop using country of origin labels on its products, completing the process of removing them from products distributed in California by October 2000. In addition, because of a subsequent and unrelated investigation by the United States Federal Trade Commission, defendants entered into a consent order that precludes them from: (1) representing "in any manner ... the extent to which any ... product" distributed in interstate commerce "is made in the United States" unless "all, or virtually all, of the component parts of such product are made in the United States and all, or virtually all, of the labor in manufacturing such product is performed in the United States"; and (2) using "the legend `All American Made,' ... or otherwise representing] that a product is entirely made in the United States unless such product is in fact 100% made in the United States."
After trial in this case, the court issued a 21-page statement of decision. It rejected plaintiffs reliance on the Federal Trade Commission Act, concluding the act did not provide a private right of action. As for section 17533.7, the court recognized it "is an extremely strict statute" but rejected defendants' claim the law was unconstitutional. It construed the section as precluding a "`Made in USA' label where the `merchandise' is entirely or substantially foreign," or "where any `article, unit, or part thereof is entirely or substantially foreign." Applying this construction, the court found certain Kwikset products manufactured between 1996 and 2000, at one point or another bore unlawful country of origin labeling because the products contained either "a screw or pin made `entirely ... outside of the United States,'" or had a "latch assembly that was sub-assembled in Mexico...."
*292 The court also found Civil Code section 1770(a)(4) applied, but since this statute was "not [as] strict," a violation of it would occur only when, viewing "the labeling from the perspective of those consumers for whom the geographic designation is important," "the merchandise as a whole is deceptively labeled." Under this construction, the court concluded "locksets that incorporate only a few screws or pins made in Taiwan are not deceptively labeled with a `Made in USA' label, but are deceptively labeled with an `All American, Made' label." In addition, "a lockset incorporating a latch assembly that was subassembled in Mexico is deceptively labeled with either designation." The court identified several Kwikset products containing labels' that violated Civil Code section 1770(a)(4). With respect to section 17500, the trial court "applie[d] the same analysis ... as ... the alleged violation of section 1770[(a)(4)]."
Although recognizing defendants "ceased all use of the USA designation on all of their locksets" in early 2000, "the court conclude[d] that it is appropriate to assure compliance with ... California [law] ... by enjoining defendants ... from labeling any lockset intended for sale in the State of California `All American Made,' or `Made in USA,' or similar unqualified language, if such lockset contains any article, unit, or part that is made, manufactured, or produced outside of the United States." In addition, the court ordered defendants to notify "retailers, dealers and distributors" in California "that any lockset in the[ir] ... inventory that contains the `Made in USA' or `All American Made' or similar designation may be returned ... for replacement with an equivalent item in compliant packaging, or ... a refund of the original purchase price." However, balancing the equities, the court declined to "order a return or refund program as to the ultimate consumers...."

DISCUSSION

1. Proposition 64
As noted, during the pendency of this appeal, the electorate approved Proposition 64. Sections 17204 and 17535, as amended by the proposition, permit the filing of an injunctive or restitutionary relief action only by certain public prosecutors and "any person who has suffered injury in fact and has lost money or property as a result of unfair competition or false advertising. (§§ 17204 & 17535.) In addition, sections 17203 and 17535 now authorize persons other than public prosecutors to "pursue representative claims or relief on behalf of others only if the claimant meets the [foregoing] standing requirements ... and complies with Section 382 of the Code of Civil Procedure [specifying the requirements for a class action]...." (§§ 17203 & 17535.) The proposition applies to this action. (Californians For Disability Rights v. Mervyn's LLC, supra, 39 Cal.4th at p. 227, 46 Cal.Rptr.3d 57, 138 P.3d 207.)
As plaintiff argues in an earlier brief, since he was not subject to Proposition 64's requirements when filing suit or at the time of trial, "[t]here is no record upon which this Court can summarily determine that Proposition 64's requirements cannot be met." Branick teaches that the trial court can consider plaintiffs motion to amend the complaint to allege facts constituting standing. (Branick, supra, 39 Cal.4th at pp. 239, 243, 46 Cal.Rptr.3d 66, 138 P.3d 214.) Thus, we shall remand this matter to the superior court with directions to afford plaintiff an opportunity to satisfy the newly enacted standing and representative claim requirements for unfair competition law and false advertising *293 law actions. In the event plaintiff is successful in this endeavor, the balance of our opinion shall stand as a resolution of the issues raised by the parties in their respective appeals.

2. Defendant's Appeal

a. Plaintiff's Unfair Competition Law Claims
The complaint contained three counts under the unfair competition law and one count alleging a violation of the false advertising law.
The unfair competition law permits a party to seek injunctive and restitutionary relief for any "unlawful, unfair or fraudulent business act or practice...." (§§ 17200, 17203 & 17204.) Thus, `"section 17200 "borrows" violations of other laws and treats them as unlawful practices' that the unfair competition law makes independently actionable. [Citations.]" (Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., supra, 20 Cal.4th at p. 180, 83 Cal.Rptr.2d 548, 973 P.2d 527; see also People ex rel. Bill Lockyer v. Fremont Life Ins. Co. (2002) 104 Cal.App.4th 508, 515, 128 Cal.Rptr.2d 463.)
Citing sections 17533.7 and 17500, Civil Code section 1770(a)(4), plus provisions of the Federal Trade Commission Act, plaintiff argued defendants'"Made in U.S.A." and similar product labeling constituted an unlawful business practice. The trial court found all three state laws supported the first cause of action. In addition, relying on Civil Code section 1770(a)(4) and section 17500, the court granted plaintiff relief on his causes of action for "unfair" and "fraudulent" business acts and practices. Defendants challenge applicability of each of the predicate statutes on different grounds.

b. Section 17533.7
Section 17533.7, part of the false advertising law, declares, "It is unlawful for any person, firm, corporation or association to sell or offer for sale in this State any merchandise on which merchandise or on its container there appears the words `Made in U.S.A.,' `Made in America,' `U.S.A.,' or similar words when the merchandise or any article, unit, or part thereof, has been entirely or substantially made, manufactured, or produced outside of the United States." A violation of this statute constitutes a misdemeanor. (§ 17534.)
Defendants contend section 17533.7 is unconstitutional because it "`chills' constitutionally protected speech," and fails to "provide fair notice of the conduct which it prohibits" or "explicit standards" for its enforcement. Alternatively, they challenge the trial court's construction of the statute to this case. These contentions lack merit.

1) "Chilling" Effect
In reviewing a constitutional attack on a statute, we begin with the presumption that the law is valid unless its constitutional infirmity is "clearly, positively, and unmistakably" established. (Tobe v. City of Santa Ana (1995) 9 Cal.4th 1069, 1107, 40 Cal.Rptr.2d 402, 892 P.2d 1145; Lockheed Aircraft Corp. v. Superior Court (1946) 28 Cal.2d 481, 484, 171 P.2d 21.)
Given the nature of the labels, plus the fact defendants attached them to Kwikset's products, the labels amounted to commercial speech. (Kasky v. Nike, Inc., (2002) 27 Cal.4th 939, 956-957, 119 Cal. Rptr.2d 296, 45 P.3d 243; Keimer v. Buena Vista Books, Inc. (1999) 75 Cal.App.4th 1220, 1227, 89 Cal.Rptr.2d 781.) While commercial speech is afforded protection by the First Amendment, "`[t]he [federal] Constitution accords less protection to commercial speech than to other constitutionally *294 safeguarded forms of expression.' [Citation.]" (Kasky v. Nike, Inc., supra, 27 Cal.4th at p. 952, 119 Cal.Rptr.2d 296, 45P.3d 243.)
In analyzing commercial speech, the first step is to determine whether it involves lawful activity and is not misleading. (Kasky v. Nike, Inc., supra, 27 Cal.4th at p. 952, 119 Cal.Rptr.2d 296, 45 P.3d 243; Keimer v. Buena Vista Books, Inc., supra, 75 Cal.App.4th at p. 1230, 89 Cal.Rptr.2d 781.) While product labeling is lawful activity, the labels here were misleading in their description of where the respective products had been produced or manufactured.
The second question is whether California has a substantial interest in enacting section 17533.7 and similar laws. Section 17533.7 appears in the chapter of the Business and Professions Code covering false advertising. "Clearly, the State of California has a fervent interest in protecting the public from advertising which is deceptive or is likely to deceive and in "`... insuring that the stream of commercial information flow cleanly as well as freely." [Citations.]' [Citation.]" (Keimer v. Buena Vista Books, Inc., supra, 75 Cal.App.4th at p. 1230, 89 Cal.Rptr.2d 781; see also People v. Superior Court (1979) 96 Cal.App.3d 181, 193, 157 Cal.Rptr. 628.) Section 17533.7 constitutes a legislative determination that representations suggesting merchandise was made in the United States are misleading unless the producer's manufacturing processes satisfy the strictures of the statute.
Third, although, as the trial court noted, section 17533.7 is a strict law, it nonetheless advances the state's interest in protecting the public from deceptive product representations. Fourth, given its specificity, referring to both merchandise as a whole, and to the constituent articles, units, or parts of merchandise, section 17533.7 is reasonably tailored to serve the interest of prohibiting deceptive product advertising. (Keimer v. Buena Vista Books, Inc., supra, 75 Cal.App.4th at p. 1231, 89 Cal.Rptr.2d 781.) Section 17533.7 does not "chill" defendants' free speech rights.

2) Vagueness
We also reject defendants' void-for-vagueness challenge to section 17533.7. "To satisfy the constitutional command [of certainty], a statute must meet two basic requirements: (1) the statute must be sufficiently definite to provide adequate notice of the conduct proscribed; and (2) the statute must provide sufficiently definite guidelines ... to prevent arbitrary and discriminatory enforcement. [Citations.]" (Tobe v. City of Santa Ana, supra, 9 Cal.4th at pp. 1106-1107, 40 Cal.Rptr.2d 402, 892 P.2d 1145.) But "[o]nly a reasonable degree of certainty is required...." (Id. at p. 1107, 40 Cal.Rptr.2d 402, 892 P.2d 1145.) A statute `""cannot be held void for uncertainty if any reasonable and practical construction can be given to its language."' [Citation.]" (Ibid.; see also Walker v. Superior Court (1988) 47 Cal.3d 112, 143, 253 Cal.Rptr. 1, 763 P.2d 852.)
"In considering whether a legislative proscription is sufficiently clear to satisfy the requirements of fair notice, `we look first to the language of the statute, then to its legislative history, and finally to California decisions construing the statutory language.' [Citations.] We thus require citizens to apprise themselves not only of statutory language but also of legislative history, subsequent judicial construction, and underlying legislative purposes [citation]." (Walker v. Superior Court, supra, 47 Cal.3d at p. 143, 253 Cal.Rptr. 1, 763 P.2d 852.) The Legislature's intent "as exhibited by the plain meaning of the actual words of the law," *295 must be followed "`"`whatever may be thought of the wisdom, expediency, or policy of the act.'"' [Citations.]" (California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist. (1997) 14 Cal.4th 627, 632-633, 59 Cal.Rptr.2d 671, 927 P.2d 1175; see also J arrow Formulas, Inc. v. LaMarche (2003) 31 Cal.4th 728, 733, 3 Cal.Rptr.3d 636, 74 P.3d 737.)
As for the fair notice requirement, Burg v. Municipal Court (1983) 35 Cal.3d 257, 198 Cal.Rptr. 145, 673 P.2d 732 presents an analogous situation. It rejected a void-for-vagueness challenge to a law making it illegal for a person to drive with a blood alcohol content of 0.10 percent or more. In response to the petitioner's claim it was impossible for him to know when his blood alcohol had reached this limit, the court noted, "The very fact that he has consumed a quantity of alcohol should notify a person of ordinary intelligence that he is in jeopardy of violating the statute. [Citation.]" (Id. at p. 271, 198 Cal.Rptr. 145, 673 P.2d 732.) Here, the mere fact defendants attached "Made in U.S.A." and similar labels to locksets built with foreign-made components and partially assembled at their Mexico plant should have alerted defendants to the possibility they were in danger of violating section 17533.7.
The second requirement is that the statute must afford sufficiently definite guidelines for enforcement of the law. Focusing on the term "substantially," defendants figuratively throw up their hands, claiming it "is not defined by the statute or any other authority" and the dictionary definition of this term "provides no guidance as to what percentage of the total making, manufacturing, or production of merchandise or any part thereof will constitute `substantially.'" We disagree.
Contrary to defendants' claim, the term "substantially" has been judicially construed. (Atchison etc. Ry. Co. v. Kings Co. Water Dist. (1956) 47 Cal.2d 140, 144, 302 P.2d 1 ["Substantially" means `"in a substantial manner; really, solidly; competently'"].) Use of the term "substantially" in criminal statutes has also been approved. (People v. Box (2000) 23 Cal.4th 1153, 1217, 99 Cal.Rptr.2d 69, 5 P.3d 130 ["substantial" used to describe capital sentencing factors; upheld]; People v. Silver (1991) 230 Cal.App.3d 389, 393-394, 281 Cal.Rptr. 354 [affirming conviction of possessing for sale a chemical substance with a "chemical structure ... substantially similar to" methamphetamine].)
Furthermore, the premise of defendants' argument, that use of this term fails to provide an adequate "standard[ ] for ... juries[ ] and judges" to apply, is answered by the Supreme Court's opinion in People v. Daniels (1969) 71 Cal.2d 1119, 80 Cal. Rptr. 897, 459 P.2d 225: "The law is replete with instances in which a person must, at his peril, govern his conduct by such nonmathematical standards as `reasonable,' `prudent,' `necessary and proper,' `substantial,' and the like. Indeed, a wide spectrum of human activities is regulated by such terms: thus one man may be given a speeding ticket if he overestimates the `reasonable or prudent' speed to drive his car in the circumstances [citation], while another may be incarcerated in state prison on a conviction of wilful homicide if he misjudges the `reasonable' amount of force he may use in repelling an assault [citation].... `There is no formula for the determination of reasonableness.' Yet standards of this kind are not impermissively vague, provided their meaning can be objectively ascertained by reference to common experiences...." (Id. at pp. 1128-1129, 80 Cal.Rptr. 897, 459 P.2d 225, italics added.) Section 17533.7 is not void for vagueness.

3) Construction of Section 17533.7
The trial court interpreted section 17533.7 to preclude the use of labels describing *296 merchandise as "Made in the U.S.A." or containing a similar import when either (1) "the merchandise ... has been entirely or substantially made, manufactured, or produced outside of the United States," or (2) "any article, unit, or part" of "the merchandise" "has been entirely or substantially made, manufactured, or produced outside of the United States." (§ 17533.7.) Defendants and our dissenting colleague challenge the correctness of this interpretation. We agree with the trial court's approach.
In construing statutes, our goal is to determine the intent of the Legislature to thereby effectuate the purpose of the law. (Curie v. Superior Court (2001) 24 Cal.4th 1057, 1063, 103 Cal.Rptr.2d 751, 16 P.3d 166.) "`Our first step [in determining the Legislature's intent] is to scrutinize the actual words of the statute, giving them a plain and commonsense meaning. [Citations.]' [Citation.]" (California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist, supra, 14 Cal.4th at p. 633, 59 Cal.Rptr.2d 671, 927 P.2d 1175.) "It is our task to construe, not to amend, the statute. `In the construction of a statute ... the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or omit what has been inserted....' [Citation.] We may not, under the guise of construction, rewrite the law or give the words an effect different from the plain and direct import of the terms used." (California Fed. Savings & Loan Assn. v. City of Los Angeles (1995) 11 Cal.4th 342, 349, 45 Cal.Rptr.2d 279, 902 P.2d 297.)
As previously noted, when interpreting a statute a court may refer to prior judicial construction of its terms (Walker v. Superior Court, supra, 47 Cal.3d at p. 143, 253 Cal.Rptr. 1, 763 P.2d 852) and should employ the common usage and understanding of the statute's words. (People v. Linwood (2003) 105 Cal.App.4th 59, 69, 129 Cal. Rptr.2d 73; Smith v. Peterson (1955) 131 Cal.App.2d 241, 246, 280 P.2d 522.) Finally, a court must give meaning to every word in the statute and avoid a construction that renders any of the law's terms surplusage. (Reno v. Baird (1998) 18 Cal.4th 640, 658, 76 Cal.Rptr.2d 499, 957 P.2d 1333.)
Application of these principles confirms the trial court read the statute correctly. First, by its repeated use of the term "merchandise," section 17533.7 is limited to personal property such as goods and wares that are bought and sold in the marketplace. (United States v. Sischo (1923) 262 U.S. 165, 168, 43 S.Ct. 511, 67 L.Ed. 925; Blackwood v. Cutting Packing Co. (1888) 76 Cal. 212, 214, 18 P. 248; Black's Law Diet. (7th ed.1999) p. 1000, col. 2.) Consequently, the law does not cover other forms of property.
Second, section 17533.7 regulates the use of "Made in U.S.A." and similar labeling only on merchandise that is "made, manufactured, or produced." "The words `made, manufactured, or constructed' cover almost everything which [human] skill ... can make out of raw materials." (United States v. Anderson (S.D.Cal.1942) 45 F.Supp. 943, 949.) "[T]here are many [judicial] holdings and statements to the effect that, to constitute manufacturing, ... the operation, process, or activity in question must result in the production of a new and different article, product, or commodity, having ... a distinctive name, character, or use. `Manufacturing,' in this connection, has also been defined, in terms or substance, as the production of articles for use from raw or prepared materials by giving such materials new forms, qualities, properties, or combinations, whether by hand labor or by machinery...." (Annot., What Constitutes Manufacturing or Who *297 Is a Manufacturer Under Tax Laws (1968) 17 A.L.R.3d 7, 23-24, fns. omitted.) Thus, one would not violate the statute by making, manufacturing, or producing merchandise solely in the United States even though using raw materials acquired from a foreign source.
Where merchandise is entirely made, manufactured, or produced outside the United States, the use of "Made in U.S.A." labels is clearly prohibited. However, the statute also prohibits the use of this labeling where merchandise is "substantially made, manufactured, or produced outside of the United States." (§ 17533.7, italics added.) Recently, the United States Supreme Court construed this term as it is used in the Americans with Disabilities Act. "`[Substantially' ... suggests `considerable' or `to a large degree.' See Webster's Third New International Dictionary 2280 (1976) (defining `substantially' as `in a substantial manner' and `substantial' as `considerable in amount, value, or worth' and `being that specified to a large degree or in the main'); see also 17 Oxford English Dictionary 66-67 (2d ed.1989) (`substantial': `[Relating to or proceeding from the essence of a thing; essential'; `[o]f ample or considerable amount, quantity, or dimensions')." (Toyota Motor Mfg., Kentucky, Inc. v. Williams (2002) 534 U.S. 184,196-197 [122 S.Ct. 681, 151 L.Ed.2d 615].) Applying a similar approach here, we conclude merchandise has been "substantially made, manufactured, or produced outside the United States" where the foreign operation, process, or activity employed to create the merchandise is found to be considerable in either amount, value, or worth.
More apropos to this case, if the merchandise at issue consists of separate, identifiable components, section 17533.7 requires "any article, unit, or part" of the merchandise to be "entirely or substantially made, manufactured, or produced" domestically to qualify for use of a "Made in U.S.A." or similar label. (§ 17533-7, italics added.) We accord these terms their usual and ordinary meanings: (1) "Article" includes "a material thing: item, object," or "a thing of a particular class or kind as distinct from a thing of another class or kind" (Webster's 3d New Internat. Diet. (1981) p. 123, capitalization omitted); (2) "Unit" means "a single thing ... that is a constituent and isolable member of some more inclusive whole" and "a piece or complex of apparatus serving to perform one particular function" (id. at p. 2500); and (3) "Part" means "a unit ... held to constitute with one or more other units something larger: constituent ... an essential portion or integral element of something" (id, at p. 1645, capitalization omitted). In light of these definitions, when merchandise consists of two or more physical elements or pieces, section 17533.7 also applies to any distinct component of merchandise that is necessary for its proper use or operation.
Kwikset manufactured locksets using screws and pins made in Taiwan. Screws and pins are distinct components clearly necessary to the proper use or operation of a lockset because without them one could not install or operate the product. In addition, part of the lockset latch assembly for some products occurred at Kwikset's Mexico plant. It is settled that product assembly is part of the manufacturing process. (General Motors Corp. v. City of Los Angeles (1971) 5 Cal.3d 229, 240, 95 Cal.Rptr. 635, 486 P.2d 163.) The trial court found the latch sub-assembly performed in Mexico constituted a substantial portion of the manufacturing process. This determination presented a factual question. While defendants argue their assembly process substantially complied with section 17533.7 and challenge *298 the trial court's application of the statute to their lockset labeling, they cite to only bits and pieces of the evidence. To sustain their insufficiency-of-the-evidence claim on appeal, defendants needed to set forth all material evidence. (Foreman & Clark Corp. v. Fallon (1971) 3 Cal.3d 875, 881, 92 Cal.Rptr. 162, 479 P.2d 362; Toigo v. Town of Ross (1998) 70 Cal.App.4th 309, 317, 82 Cal.Rptr.2d 649.) In the absence of an adequate summary of the trial record, we deem their evidentiary challenge waived and presume the evidence supports the trial court's findings. (Ibid.)
At our request, the parties provided us with section 17533.7's legislative history." The Legislature enacted section 17533.7 in 1961 and has never amended it. (Stats.1961, ch. 676, § 1, p. 1915.) Plaintiff notes two unsuccessful attempts to amend the law, one that would have eliminated the reference to "any article, unit, or part" of merchandise, and a second seeking to insert a percentage of manufacture test. As the Attorney General notes, legislative inaction is of very "little value" in construing the terms of a statute. (Grupe Development Co. v. Superior Court (1993) 4 Cal.4th 911, 922-923, 16 Cal.Rptr.2d 226, 844 P.2d 545.) To the extent one can draw any conclusion from the legislative history, it is that the Legislature was made aware of concerns about the breadth of section 17533.7's scope and declined to narrow it.
Defendants, and the dissent, extensively employ hypothetical not relevant to the facts of this case to argue at length concerning section 17533.7's potentially "absurd" consequences. We acknowledge that difficulties may arise in applying section 17533.7 to marginal situations. But this case does not present such circumstances.
We also share our dissenting colleague's angst about both the effect of this law, particularly in an age of global trade, and the potential for abuse that may arise under the unfair competition law. If we had the power to do so, we would rewrite the statute to address those concerns. But our Supreme Court has cautioned "`the judicial role in a democratic society is fundamentally to interpret laws, not to write them. The latter power belongs primarily to the people and the political branches of government....' [Citation.] It cannot be too often repeated that due respect for the political branches of our government requires us to interpret the laws in accordance with the expressed intention of the Legislature. `This court has no power to rewrite the statute so as to make it conform to a presumed intention which is not expressed.' [Citations.]" (California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist., supra, 14 Cal.4th at p. 633, 59 Cal.Rptr.2d 671, 927 P.2d 1175.) Neither the wisdom of the law nor the availability of alternative, less drastic remedies is a proper factor for our consideration. (Burg v. Municipal Court, supra, 35 Cal.3d at p. 267, 198 Cal.Rptr. 145, 673 P.2d 732.)
We conclude the trial court properly interpreted and applied section 17533.7 to the facts of this case.

c. Civil Code Section 1770(a) 4)
The second predicate statute supporting plaintiffs unfair competition law claim is Civil Code section 1770(a)(4). It declares, "The following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful: [¶] ... [¶] (4) Using deceptive representations or designations of geographic origin in connection with goods or services."
*299 In its statement of decision, the trial court applied Civil Code section 1770(a)(4) as follows: "The evidence did establish that there are those citizens for whom the 'Made in USA' label is an important part of their buying decision. Obviously, there are many others for whom the geographic origin has little or no importance. A deceptive label to one person may not be a deceptive label in the view of others. However, the court concludes that it must view the labeling from the perspective of those consumers for whom the geographic designation is important, but must do so reasonably."
Defendants argue the trial court employed an incorrect legal standard in determining whether their country of origin product labeling was deceptive under Civil Code section 1770(a)(4). Referring to the Federal Trade Commission Act, defendants argue the correct test is whether '"there is a representation, omission, or practice that ... is likely to mislead consumers acting reasonably under the circumstances, and ... the representation omission, or practice is material....'"
The Second District has held "the reasonable consumer standard" applies to actions involving claims under the Consumer Legal Remedies Act (Civ.Code, § 1750 et seq.) of which Civil Code section 1770(a)(4) is a part. (Consumer Advocates v. Echostar Satellite Corp. (2003) 113 Cal.App.4th 1351, 1360, 8 Cal.Rptr.3d 22.) That standard is aptly described in Lavie v. Procter & Gamble Co. (2003) 105 Cal.App.4th 496, 129 Cal.Rptr.2d 486: "Where advertising is aimed at a particularly susceptible audience  its truthfulness must be measured by the impact it will likely have on members of that group, not others to whom it was not primarily directed. [Citation.] We also recognize that an advertisement may be designed to appeal to specific groups of consumers, although it is ostensibly directed to the public at large. Where the plaintiff contends that a more vulnerable subgroup is the true target of such an advertisement, a question of fact is presented, which the trial court must resolve. [¶] However, unless the advertisement targets a particular disadvantaged or vulnerable group, it is judged by the effect it would have on a reasonable consumer. [Citation.]" (Id. at pp. 506-507, 129 Cal. Rptr.2d 486.)
The trial court's approach complied with this standard. It recognized that not everyone is swayed by the presence of a "Made in U.S.A." or similar label when deciding to purchase merchandise. But here plaintiff presented testimony, and the trial court found, that for some people country of origin labeling is a critical factor when making a purchasing decision. In addition, the court also recognized the need for an element of reasonableness on the part of a prospective purchaser. The validity of the trial court's finding presented a factual question. To the extent defendants challenge the evidentiary sufficiency for the trial court's decision, they again failed to adequately preserve the issue for review. (Foreman & Clark Corp. v. Fallon, supra, 3 Cal.3d at p. 881, 92 Cal.Rptr. 162, 479 P.2d 362; Toigo v. Town of Ross, supra, 70 Cal.App.4th at p. 317, 82 Cal.Rptr.2d 649.) Consequently, we conclude the trial court applied the appropriate standard for deception in finding defendants violated Civil Code section 1770(a)(4).

d. Defendants' Extrinsic Evidence Claim
As to the use of both Civil Code section 1770(a)(4) and section 17500 as predicate statutes under the unfair competition law, plus the merits of the fourth cause of action for false advertising, defendants argue plaintiff introduced merely *300 "anecdotal evidence" in the form of oral testimony by consumers who claimed they were misled by the country of origin labels. Defendants rely on two federal decisions they assert mandate an unfair competition law claim be based on extrinsic evidence such as a consumer survey. (See Churchill Village L.L.C. v. General Electric Co. (N.D.Cal.2000) 169 F.Supp.2d 1119, 1131; Haskell v. Time, Inc. (E.D.Cal.1997) 965 F.Supp. 1398, 1407.) Since plaintiff did not present any such evidence, defendants contend the judgment on these grounds must be reversed.
This argument was recently considered and rejected in Brockey v. Moore (2003) 107 Cal.App.4th 86, 131 Cal.Rptr.2d 746. Brockey involved a successful action by mobile home tenants against one who, although not a lawyer, operated businesses named "Legal Aid" and "Legal Aid Services," and accepted monies from the plaintiffs to assist them in defending unlawful detainer actions. On appeal, the defendant argued the evidence failed to support the judgment. Citing the foregoing federal cases, he claimed the tenants "had to prove *via extrinsic evidence' that his misstatements would likely deceive a reasonable person (not merely a vulnerable person) and that what he terms `anecdotal' evidence, that is, testimony by people that they were in fact misled, is insufficient." (Id. at p. 99, 131 Cal. Rptr.2d 746.)
The Court of Appeal rejected this argument, stating "`that the primary evidence in a false advertising case is the advertising itself.' The United States Supreme Court has rejected a claim that survey evidence was required in the analogous context of the Federal Trade Commission's regulation of deceptive advertising. [Citations.] [¶] In trade name disputes and cases construing California's prior unfair competition law (former Civ.Code, § 3369), the courts acknowledged that the `likelihood of confusion' between names was a factual question, but in some cases `the comparison of the two names themselves may be adequate to establish the likelihood of confusion.' [Citations.]" (Brockey v. Moore, supra, 107 Cal.App.4th at p. 100, 131 Cal.Rptr.2d 746.)
As for the extrinsic evidence argument, the court concluded the defendant "fails to cite a single California case requiring use of survey evidence in unfair business practices cases.... Generally, [the federal cases cited by the defendant] involve a very few persons claiming to be misled and do not hold that `anecdotal' evidence can never suffice. [Citation.] The Attorney General points out and [the defendant] concedes that these cases have imported into the California [unfair competition law] standards of proof derived from federal Lanham Act cases, where misleading, rather than false, statements must be shown to have deceived a `significant portion' of the recipients. [Citation.] We are not persuaded that these cases accurately reflect California law." (Brockey v. Moore, supra, 107 Cal.App.4th at p. 99, 131 Cal. Rptr.2d 746.)
We find Brockey's analysis persuasive. In light of that decision, defendants' insufficiency of the evidence claims concerning Civil Code section 1770(a)(4) and section 17500 fail.

e. Attorney Fees
The trial court awarded plaintiff nearly $3 million in attorney fees under Code of Civil Procedure section 1021.5. The final page of defendants' opening brief asserts "[b]ecause the trial court's judgment must be reversed for the reasons set forth ... above, the trial court's order awarding ... fees ... must be reversed." However, *301 defendants challenge only plaintiffs right to recover fees, not the amount approved by the trial court. Given our affirmance of the judgment and defendant's failure to challenge the amount of fees, we have no option but to affirm the award.

3. Plaintiffs Appeal

a. Introduction

Plaintiffs appeal presents five claims, but only three of them require extensive review. First, plaintiff contends the trial court erred when it found sections 45 and 45a of the Federal Trade Commission Act did not constitute predicate statutes supporting his unfair competition law claim. Because we affirm the trial court's judgment as to sections 17533.7 and 17500, and Civil Code section 1770(a)(4), the applicability of the Federal Trade Commission Act is moot. (See Forbes v. Cameron Petroleums, Inc. (1978) 83 Cal.App.3d 257, 267, 147 Cal.Rptr. 766.)
Second, plaintiffs brief asserted the trial court erred by denying his request for restitution to consumers who purchased Kwikset's unlawfully labeled products. By letter received shortly before oral argument, plaintiff advised the court he has abandoned this issue. We now turn to the remaining three issues.

b. Sufficiency of Restitution
In the judgment, the trial court directed defendants to advise California retailers and distributors that improperly labeled products still in their inventory could be returned "for replacement with an equivalent item in compliant packaging, or, at [defendants' option, a refund...." Plaintiff contends the trial court erred by allowing defendants to choose the form of restitution to retailers and distributors, claiming it effectively made the decision to grant any restitution "optional."
A trial court has "very broad" discretion in formulating equitable relief in unfair competition law actions. (Cortex v. Purolator Air Filtration Products Co. (2000) 23 Cal.4th 163, 180, 96 Cal.Rptr.2d 518, 999 P.2d 706.) "Section 17203 does not mandate restitutionary or injunctive relief when an unfair business practice has been shown. Rather, it provides that the court `may make such orders or judgments ... as may be necessary to prevent the use or employment ... of any practice which constitutes unfair competition ... or ... to restore ... money or property.' [Citation.] That is, as our cases confirm, a grant of broad equitable power. A court cannot properly exercise an equitable power without consideration of the equities on both sides of a dispute." (Ibid.)
No abuse of discretion appears in this case. The sole issue was the deceptive nature of defendants' country of origin product labeling. No issue was raised concerning the operation of the locksets. Thus, offering refunds or repackaging of the same merchandise would be permissible.

c. The Award of Costs to Technolock
Next, plaintiff attacks the portion of the trial court's postjudgment order allowing Technolock to recover its costs. Plaintiff claims "Technolock ... is united in interest with, and made identical defenses as, its co-[d]efendants Kwikset and Black & Decker, both of which were losing parties in this case."
Generally, the term "`[prevailing party' includes ... a defendant as against those plaintiffs who do not recover any relief against that defendant." (Code Civ. Proc., § 1032, subd. (a)(4).) Cases recognize the application of this provision is discretionary where a prevailing defendant was "united in interest and shared the same *302 counsel" as another defendant found to be liable. (Slavin v. Fink (1994) 25 Cal. App.4th 722, 725-726, 30 Cal.Rptr.2d 750; see also Webber v. Inland Empire Investments, Inc. (1999) 74 Cal.App.4th 884, 920, 88 Cal.Rptr.2d 594.) Here, the issue concerned not the manufacture of the locksets, but rather the deceptive nature of the country of origin labels placed on the packaging. There is no indication Technolock participated in this activity. Thus, the trial court did not abuse its discretion in awarding costs to Technolock.

d. The Scope of Recovery Under Code of Civil Procedure Section 1021.5
Code of Civil Procedure section 1021.5 (section 1021.5) authorizes a trial court to "award attorneys' fees to a successful party" in cases where it finds the requirements for a private attorney general action have been satisfied. The trial court found plaintiff was entitled to recover attorney fees under this statute and made an award. In addition, plaintiff sought to recover over $400,000 in fees for retained expert witnesses and investigators, plus charges for long distance telephone calls, copying, faxes, overnight deliveries, messenger services, and other miscellaneous expenses under section 1021.5. Code of Civil Procedure section 1033.5 declares the "[f]ees of experts not ordered by the court," plus "[p]ostage, telephone, and photocopying charges," are "not allowable as costs, except when expressly authorized by law." (Code Civ. Proc., § 1033.5, subd. (b)(1) & (3).) Relying on Ripley v. Pappadopoulos (1994) 23 Cal.App.4th 1616, 28 Cal.Rptr.2d 878, the trial court denied plaintiffs request for the additional expenses. Plaintiff challenges the trial court's denial, citing section 1021.5 and Beasley v. Wells Fargo Bank (1991) 235 Cal.App.3d 1407, 1 Cal.Rptr.2d 459.
The right to recover costs is purely a creature of statute, and the applicable statute defines the extent of a party's right to recover costs. (Murillo v. Fleetwood Enterprises, Inc. (1998) 17 Cal.4th 985, 989, 73 Cal.Rptr.2d 682, 953 P.2d 858; Davis v. KGO-T.V., Inc. (1998) 17 Cal.4th 436, 439, 71 Cal.Rptr.2d 452, 950 P.2d 567; Estate of Johnson (1926) 198 Cal. 469, 471, 245 P. 1089.) Thus, absent statutory authorization, parties engaged in civil litigation must bear their own expenses in a lawsuit. (Davis v. KGO-T.V., Inc., supra, 17 Cal.4th at p. 439, 71 Cal.Rptr.2d 452, 950 P.2d 567; Ripley v. Pappadopoulos, supra, 23 Cal.App.4th at p. 1622, 28 Cal. Rptr.2d 878.) As noted, Code of Civil Procedure section 1033.5 precludes recovery of the fees and expenses sought by plaintiff "except when expressly authorized by law." (Code Civ. Proc., § 1033.5, subd. (b)(1) & (3).)
Under the plain language doctrine, a court's first step in determining legislative intent when construing a statute is to review the words used in the statute, giving the terms their plain and ordinary meaning. (California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist., supra, 14 Cal.4th at p. 633, 59 Cal.Rptr.2d 671, 927 P.2d 1175.) If the statutory language is clear, no further statutory construction is necessary. (Nolan v. City of Anaheim (2004) 33 Cal.4th 335, 340, 14 Cal.Rptr.3d 857, 92 P.3d 350; Trope v. Katz (1995) 11 Cal.4th 274, 280, 45 Cal. Rptr.2d 241, 902 P.2d 259.) Only when a statute's terms are subject to more than one reasonable interpretation, may a court consider "extrinsic aids" (Nolan v. City of Anaheim, supra, 33 Cal.4th at p. 340, 14 Cal.Rptr.3d 857, 92 P.3d 350) in construing the statute. (Ibid.; see also Jarrow Formulas, Inc. v. LaMarche, supra, 31 Cal.4th at p. 735, 3 Cal.Rptr.3d 636, 74 P.3d 737.)
*303 Section 1021.5 authorizes recovery of "attorneys' fees." California case law has long recognized "the usual and ordinary meaning of the words `attorney's fees,' both in legal and in general usage, is the consideration that a litigant actually pays or becomes liable to pay in exchange for legal representation." (Trope v. Katz, supra, 11 Cal.4th at p. 280, 45 Cal.Rptr.2d 241, 902 P.2d 259; see also Flannery v. Prentice (2001) 26 Cal.4th 572, 579, 110 Cal.Rptr.2d 809, 28 P.3d 860.) The definition of attorney fees must be contrasted with the definition of "costs," which has been construed to mean "`those fees and charges which are required by law to be paid to the courts, or some of their officers' or an amount which is expressly fixed by law as recoverable as costs. [Citations.]" (Gibson v. Thrifty Drug Co. (1959) 173 Cal.App.2d 554, 556, 343 P.2d 610; see also Davis v. KGO-T.V., Inc., supra, 17 Cal.4th at pp. 439-140, 71 Cal. Rptr.2d 452, 950 P.2d 567.) "The `costs' of a civil action ... usually exclud[e] attorney fees." (Davis v. KGO-T.V, Inc., supra, 17 Cal.4th at p. 439, 71 Cal.Rptr.2d 452, 950 P.2d 567.)
Trope held a law firm successfully representing itself in litigation could not recover compensation for its time and effort under a contractual provision governed by Civil Code section 1717 that authorized the prevailing party to recover its attorney fees. (Trope v. Katz, supra, 11 Cal.4th at p. 292, 45 Cal.Rptr.2d 241, 902 P.2d 259.) Subsequent decisions have recognized exceptions to this holding. (PLCM Group, Inc. v. Drexler (2000) 22 Cal.4th 1084, 1097, 95 Cal.Rptr.2d 198, 997 P.2d 511 [prevailing party's in-house counsel entitled to recover fees]; Laborde v. Aronson (2001) 92 Cal. App.4th 459, 467-469, 112 Cal.Rptr.2d 119 [pro se attorney entitled to recover sanctions under Code Civ. Proc., § 128.7]; Abandonato v. Coldren (1995) 41 Cal. App.4th 264, 267-268, 48 Cal.Rptr.2d 429 [same concerning Code Civ. Proc., § 128.5 sanctions].) But none of these cases questioned Trope's definition of attorney's fees.
Some California cases have held the concept of attorney fees includes the charges incurred for work performed by paralegals. (Guinn v. Dotson (1994) 23 Cal. App.4th 262, 268, 28 Cal.Rptr.2d 409; Sundance v. Municipal Court (1987) 192 Cal. App.3d 268, 274-275, 237 Cal.Rptr. 269 and cases cited therein.) To date, only one case has held expert witness fees or the other abovementioned expenses fall within the concept of attorney fees.
That one exception is Bussey v. Affleck (1990) 225 Cal.App.3d 1162, 275 Cal.Rptr. 646, an opinion from the same court that later issued Beasley v. Wells Fargo Bank, supra, 235 Cal.App.3d 1407, 1 Cal.Rptr.2d 459. Bussey held a prevailing party in an action on a contract containing a clause authorizing recovery of attorney fees and costs could recover expert witness fees, plus photocopying, messenger, express mail, telephone, and travel expenses, as part of its attorney fees. "We conclude that where a contract provides for payment of costs and attorney's fees, the court may allow disbursements of counsel as attorney fees under section 1033.5, subdivision (a)(10) [allowable costs include attorney fees authorized by contract, statute, or law], if they represent expenses ordinarily billed to a client and are not included in the overhead component of counsel's hourly rate." (Bussey v. Affleck, supra, 225 Cal.App.3d at p. 1166, 275 Cal.Rptr. 646.)
Every subsequent published decision confronting this issue has criticized and rejected Bussey's approach. (E.g., Carwash of America-PO v. Windswept Ventures No. I (2002) 97 Cal.App.4th 540, 543-544, 118 Cal.Rptr.2d 536; Fairchild v. Park (2001) 90 Cal.App.4th 919, 930-931, 109 Cal.Rptr.2d 442; First Nationwide *304 Bank v. Mountain Cascade, Inc. (2000) 77 Cal.App.4th 871, 878, 92 Cal.Rptr.2d 145; Robert L. Cloud & Associates, Inc. v. Mikesell (1999) 69 Cal.App.4th 1141, 1153-1154, 82 Cal.Rptr.2d 143; Ripley v. Pappadopoulos, supra, 23 Cal.App.4th at pp. 1622-1628, 28 Cal.Rptr.2d 878.) In Ripley, the case relied on by the trial court, the appellate court summarized the reasons for rejecting Bussey. "In Bussey the court attempted to avoid the statutory prohibition against the inclusion of expert witness fees in a cost award by equating expert witness fees and other nonallowable costs of litigation with attorney fees and by concluding that such costs may be included in an award of contractual attorney fees. We cannot adhere to that approach. In the absence of some specific provision of law otherwise, attorney fees and the expenses of litigation, whether termed costs, disbursements, outlays, or something else, are mutually exclusive, that is, attorney fees do not include such costs and costs do not include attorney fees. [Citations.] This is too well established in too many different contexts to be doubted.... In view of the clear distinction that has always been drawn between attorney fees and the expenses of litigation, we cannot disregard the Legislature's express prohibition against the inclusion of expert witness fees in a cost award by equating such expenses with attorney fees." (Ripley v. Pappadopoulos, supra, 23 Cal. App.4th at pp. 1625-1626, 28 Cal.Rptr.2d 878, italics added:)
While some opinions have approved the recovery of expenses not authorized by Code of Civil Procedure section 1033.5 in contract actions where the prevailing party pleads and proves them as damages at trial (First Nationwide Bank v. Mountain Cascade, Inc., supra, 77 Cal.App.4th at pp. 878-879, 92 Cal.Rptr.2d 145; Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co. (1996) 47 Cal.App.4th 464, 491-492, 54 Cal.Rptr.2d 888; Ripley v. Pappadopoulos, supra, 23 Cal.App.4th at p. 1627, 28 Cal.Rptr.2d 878), that is not the situation here. Plaintiff sought recovery of his expert witness fees and other nonrecoverable expenses by a postjudgment motion.
The California Supreme Court reached a conclusion similar to Ripley and its progeny under analogous circumstances in Davis v. KGO-T.V., Inc., supra, 17 Cal.4th 436, 71 Cal.Rptr.2d 452, 950 P.2d 567. Davis found Government Code section 12965, subdivision (b), which at the time authorized a court to award attorney fees and costs to the prevailing party in an action under the Fair Employment and Housing Act (FEHA), did not permit recovery of the successful litigant's expert witness fees. "[B]oth before and after ... section 12965, subdivision (b), was enacted, the fees of experts not ordered by the court were not an item of allowable costs. Code of Civil Procedure section 1033.5 simply codified prior law to that effect. [¶] ... [T]he Legislature has created exceptions to the general rule concerning costs[ ] by expressly authorizing the shifting of the fees of an expert in specific types of actions.... [¶] Although it could have done so, it did not authorize a similar exception to the general rule for parties in a FEHA action. Without such express authorization, the trial court's discretion in a FEHA action is limited to determining whether any allowable costs were `reasonably necessary' and `reasonable in amount' (Code Civ. Proc., § 1033.5, subd. (c)(2) & (3)), and to awarding or denying additional items of costs that are not mentioned as either allowable or nonallowable in Code of Civil Procedure section 1033.5. [Citation.]" (Davis v. KGO-T.V., Inc., supra, 17 Cal.4th at p. 442, 71 Cal.Rptr.2d 452, 950 P.2d 567.)
In West Virginia University Hospitals, Inc. v. Casey (1991) 499 U.S. 83, 111 S.Ct. *305 1138, 113 L.Ed.2d 68 the United States Supreme Court reached a similar conclusion as to 42 United States Code section 1988, which at the time allowed recovery of "`a reasonable attorney's fee'" in civil rights actions. The court held section 1988 did not authorize recovery of expert witness fees. It rejected a suggestion the statute's "`broad remedial purposes'" permitted the statute to be construed as including expert witness fees noting, "there has never been, to our knowledge, a practice of including the cost of expert services within attorneys' hourly rates." (West Virginia University Hospitals, Inc. v. Casey, supra, 499 U.S. at p. 99, 111 S.Ct. 1138.)
Plaintiff relies on the contrary reasoning and result reached in Beasley v. Wells Fargo Bank, supra, 235 Cal.App.3d 1407, 1 Cal.Rptr.2d 459. In Beasley, the plaintiffs prevailed in an action challenging defendant-bank's assessment of certain fees. The trial court awarded the plaintiffs their attorney fees, plus their expert witness fees, photocopying, postage, and travel expenses under section 1021.5. The defendant challenged the latter part of the award, citing the United States Supreme Court's then-recent decision in West Virginia University Hospitals, Inc. v. Casey, supra, 499 U.S. 83, 111 S.Ct. 1138, 113 L.Ed.2d 68.
Beasley reasoned section 1021.5 "was an explicit reaction to Alyeska Pipeline Co. v. Wilderness Society (1975) 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141, which held that federal courts could no longer award attorney fees in private attorney general actions without specific statutory authorization," and "that, `... in framing the provisions of section 1021.5 the Legislature drew heavily upon the pre-Alyeska federal decisions.'" (Beasley v. Wells Fargo Bank, supra, 235 Cal.App.3d at p. 1420, 1 Cal.Rptr.2d 459.) Thus, these `"authoritieswhile no longer viable in the federal realmwill often be helpful and reliable guides in interpreting the various provisions of the California statutes.' [Citation.]" (Ibid.) The court then cited one pre-Alyeska federal appellate decision and three pre-Alyeska federal district court opinions that had authorized recovery of "expert witness fees and similar expenses" in addition to attorney fees "on a private attorney general theory...." (Id. at pp. 1420-1421, 1 Cal.Rptr.2d 459.)
We conclude Beasley's reasoning is flawed. Rather than focusing on section 1021.5's language and attempting to harmonize it with Code of Civil Procedure section 1033.5 and other relevant statutes, Beasley simply referred to section 1021.5's legislative history and assumed that because some prior federal decisions had allowed recovery of expert witness fees under the now-invalid federal common law private attorney general doctrine, that meant the Legislature must have intended to allow recovery of these expenses under section 1021.5. In Davis v. KGO-T.V., Inc., supra, 17 Cal.4th 436, 71 Cal.Rptr.2d 452, 950 P.2d 567, the Supreme Court acknowledged Beasley's holding, but expressly declined to consider the question of whether expert witness fees could be recovered in an age discrimination lawsuit brought under the private attorney general theory. (Id. at p. 446, fn. 5, 71 Cal. Rptr.2d 452, 950 P.2d 567.) Nonetheless, Davis's analysis of whether a FEHA statute authorizing the recovery of only attorney fees and statutorily authorized costs could be interpreted to include the recovery of expert witness fees conforms to the approach followed in Ripley and its progeny concerning the recoverability of expert witness fees and other expenses that are not otherwise recoverable as costs.
The same approach also applies here. Section 1021.5 authorizes recovery of attorney *306 fees by the prevailing party. Since the statute does not mention costs, we conclude the Legislature intended Code of Civil Procedure section 1033.5, the general costs statute, to apply. Section 1033.5 precludes recovery of expert witness fees and the other expenses sought by plaintiff "except when expressly authorized by law." (Code Civ. Proc., § 1033.5, subd. (b)(1) & (3).) As even Beasley grudgingly acknowledges, the Legislature has enacted several statutes expressly permitting recovery of expert witness fees in certain actions. (Beasley v. Wells Fargo Bank, supra, 235 Cal.App.3d at p. 1420, fn. 5, 1 Cal.Rptr.2d 459.) Thus, the Legislature clearly knows how to authorize recovery of otherwise nonallowable expenses when it wants to do so.
While section 1021.5 does authorize recovery of attorney fees, only Beasley and that court's prior decision in Bussey v. Affleck, supra, 225 Cal.App.3d 1162, 275 Cal.Rptr. 646 support a conclusion that the concept of attorney fees includes the expenses at issue in this case. For the reasons stated, we believe the holdings in Beasley and Bussey conflict with the statutory language and with a substantial body of case law. Nor would recovery of these expenses comport with the California Supreme Court's general definition of attorney fees or its reasoning in Davis v. KGO-T.V., Inc., supra, 17 Cal.4th 436, 71 Cal.Rptr.2d 452, 950 P.2d 567. In the federal context, Casey outright rejected the same argument as to expert witness fees, declaring no authority permitted the consideration of this expense in calculating an attorney fee. Thus, applying the plain language doctrine and construing the words of section 1021.5, we conclude the Legislature clearly intended to authorize recovery of attorney fees in private attorney general actions, but limited the recovery of other expenses to the costs generally allowed in litigation. (See Code Civ. Proc., § 1033.5.)
As a result, we hold the trial court properly denied plaintiffs request for his expert witness fees and other expenses not authorized as recoverable litigation costs. (Ripley v. Pappadopoulos, supra, 23 Cal. App.4th at pp. 1625-1626, 28 Cal.Rptr.2d 878.)

DISPOSITION
As to defendant Technolock, S.A. de C.V., the judgment and postjudgment order are affirmed. As to defendants Kwikset Corporation and Black & Decker Corporation, the judgment and postjudgment order are vacated and the matter is remanded to the superior court with directions to afford plaintiff an opportunity to move for leave to file an amended complaint that alleges facts establishing the standing and representative action requirements for unfair competition law and false advertising law claims as implemented by Proposition 64. Plaintiff must file his motion for leave to amend within 30 days of the filing of the remittitur. The court shall then determine whether plaintiff has satisfactorily alleged facts supporting his standing and the right to maintain this lawsuit as a representative action. In the event plaintiff successfully alleges and proves his right to relief under the unfair competition law and the false advertising law, as amended by Proposition 64, the court shall reenter its original judgment. If plaintiff fails to plead or prove his right to maintain this lawsuit, the court shall enter a judgment dismissing the action. Both parties' requests for judicial notice are granted. The parties shall bear their own costs on appeal.
I CONCUR: BEDSWORTH, J.
*307 SILLS, P.J., Dissenting.
Although I agree with everything my colleagues have to say regarding the Proposition 64 aspect of the case, I must reluctantly dissent because the majority leaves the door open for the possibility of further litigation on the merits.
I believe that the governing statute, Business and Professions Code section 17533.7, must be given a common sense interpretation under the circumstances of this case, lest the statute lead to absurd results. Consider: Would anyone really dispute the idea that the aircraft carrier U.S.S. Ronald Reagan, built by American shipworkers in Newport News, Virginia, was "made in America"? And yet if we take the statute too literally, the mere fact that a single television monitor in the communications section of the ship came from Taiwan would mean the ship itself was not "made in America." After all, a "part thereof was "entirely or substantially made" outside the United States"part" in a hyper-literal sense at least.
I do not believe the statute should be read that way. Statutes should be interpreted to be internally consistent. (People v. Moroney (1944) 24 Cal.2d 638, 642-643, 150 P.2d 888; Brown v. Guy (1959) 167 Cal.App.2d 211, 214, 334 P.2d 67 ["It is a cardinal rule of statutory construction that parts of a statute must be construed together and harmonized as far as possible to avoid repugnancy...."].)
A hyper-literal interpretation of the statute means that a product, like U.S.S. Ronald Reagan, can be overwhelmingly and substantially "made in the United States" but could not be claimed to have been "made in the United States" unless it contained absolutely 100 percent American parts, down to the last screw. Even as a matter of literal textual analysis, the problem with that interpretation is it reads the word "substantially" out of the statute as it affects the merchandise as a whole.
And we know the statute refers to merchandise as a whole as well as its constituent parts because by its terms it differentiates "merchandise"by the use of the word "or"from "any article, unit, or part thereof." An interpretation which requires every last part itself to be at least substantially made in America renders the word "substantially" useless insofar as it refers to merchandise as a whole. If the Legislature had really meant to say that every last part, down to the last screw, had to be at least substantially made in the United States, then it didn't need to speak of the merchandise itself being "substantially made" in the United States. Every last part would have to be made in America anyway.
Our Supreme Court has repeatedly adhered to the rule that statutes are to be interpreted in the light of reason and common sense. (See People v. Mulholland (1940) 16 Cal.2d 62, 69, 104 P.2d 1045 ["`We are unable to accept such construction of the law. It is the duty of the courts to construe such enactments in the light of reason.'"]; Great Western Distillery Products, Inc. v. John A. Wathen Distillery Co. (1937) 10 Cal.2d 442, 446, 74 P.2d 745 ["`Statutes are interpreted in the light of reason and common sense....'"]; People v. Ventura Refining Co. (1928) 204 Cal. 286, 292, 268 P. 347 ["Absurd or unjust results will never be ascribed to the legislature, and it will not be presumed to have used inconsistent provisions as to the same subject in the immediate context."]; Uhl v. Badaracco (1926) 199 Cal. 270, 284, 248 P. 917 ["To adopt the construction contended for by the city would be contrary to common sense and the general policy of the law."])
It is also well established that the literal meaning of the words of a statute may be *308 disregarded to avoid absurd results. (People v. Anzalone (1999) 19 Cal.4th 1074, 1079, 81 Cal.Rptr.2d 315, 969 P.2d 160; California School Employees Assn. v. Governing Board (1994) 8 Cal.4th 333, 340, 33 Cal.Rptr.2d 109, 878 P.2d 1321; Times Mirror Co. v. Superior Court (1991) 53 Cal.3d 1325, 1334, fn. 7, 283 Cal.Rptr. 893, 813 P.2d 240; County of Sacramento v. Hickman (1967) 66 Cal.2d 841, 849, fn. 6, 59 Cal.Rptr. 609, 428 P.2d 593; Silver v. Brown (1966) 63 Cal.2d 841, 845, 48 Cal. Rptr. 609, 409 P.2d 689; California Ins. Guarantee Assn. v. Workers' Comp. Appeals Bd. (2003) 112 Cal.App.4th 358, 363, 5 Cal.Rptr.3d 127; Upland Police Officers Assn. v. City of Upland (2003) 111 Cal. App.4th 1294, 1304, 4 Cal.Rptr.3d 629; People v. Gnass (2002) 101 Cal.App.4th 1271, 1302, 125 Cal.Rptr.2d 225; Dowling v. Zimmerman (2001) 85 Cal.App.4th 1400, 1427, 103 Cal.Rptr.2d 174; Guardianship of Elan E. (2001) 85 Cal.App.4th 998, 1001, 102 Cal.Rptr.2d 528; People v. Pecci (1999) 72 Cal.App.4th 1500, 1507, 86 Cal. Rptr.2d 43; People v. Buena Vista Mines, Inc. (1996) 48 Cal.App.4th 1030, 1034-1035, 56 Cal.Rptr.2d 21; Havlicek v. Coast-to-Coast Analytical Services, Inc. (1995) 39 Cal.App.4th 1844, 1856, 46 Cal.Rptr.2d 696; Unzueta v. Ocean View School Dist. (1992) 6 Cal.App.4th 1689, 1698, 8 Cal.Rptr.2d 614; California Ins. Guarantee Assn. v. Liemsakul (1987) 193 Cal.App.3d 433, 439, 238 Cal.Rptr. 346; see also Eyston v. Studd (K.B.1574) 75 Eng. Rep. 688, 2 Plowd. 459.)
There is also the rule of substantial compliance. As explained by our Supreme Court in Stasher v. Harger-Haldeman (1962) 58 Cal.2d 23, 29, 22 Cal.Rptr. 657, 372 P.2d 649, "Substantial compliance, as the phrase is used in the decisions, means actual compliance in respect to the substance essential to every reasonable objective of the statute." (Emphasis added.)
Instead of an interpretation that obliterates the word "substantially" when referring to the merchandise itself, I would hold that the most reasonable way to interpret the statute is to recognize that if the merchandise is substantially made in the United States and it is substantially made up of parts made in the United States, then it can still be advertised as made in the United States even though not every single part was (wholly or substantially) made in the United States.
This interpretation gives meaning and realistic effect to the intent of the Legislature. The Legislature cannot possibly have intended to prevent practically every American manufacturer from being able to advertise that its products were made in America. The statute was clearly aimed at substance, catching manufacturers who used substantially foreign parts or outsourced a substantial part of the assembly. It was not aimed at American manufacturers who substantially used American parts and assembled the product in America.
Finally, I cannot accept that a statute which was designed to prevent fraudulent claims of American manufacture should be interpreted in a way to give incentive for firms to relocate plants and jobs overseas. The Legislature never envisioned that a law enacted simply to make sure that claims of "Made in America" are genuine would be used to chase workers and jobs out of California.