Filed 6/29/21  In re S.B. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re S.B., a Person Coming Under the Juvenile Court Law. | |
| SOLANO COUNTY HEALTH AND SOCIAL SERVICES DEPARTMENT,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>SARAH B.,<br><br>        Defendant and Appellant. | A160627<br><br>(Solano County<br>Super. Ct. No. J44883) |

The juvenile court sustained allegations Sarah B. (mother) has a history of leaving her three children without appropriate parental supervision, declared them dependents, and removed them from her custody. She now appeals the disposition order, arguing the court erred in asserting dependency jurisdiction and, at a minimum, the children should not have been removed from her physical custody during the dependency case.

We affirm.

1

# BACKGROUND

In late January 2020,[1] mother began renting a bedroom for her and her three children in the Vallejo, California home of a man she had met through her sister and nephew (we refer to him as "housemate"). At the time, her older daughter, S., was eleven years old, her son, D., was nine, and her younger daughter, I., was five.

Her son has asthma which, although usually managed at home, had necessitated many trips to the hospital (eight or ten times in the previous three years). On Monday, March 2, a little more than a month after the family had moved in to the shared home, the nine-year-old boy had a severe asthma attack at about 2 a.m. and mother took him to the hospital in the middle of the night. The two didn't return home until about 5 a.m. Then, around 9:00 a.m., mother left home.

The next day, Tuesday, March 3, mother's housemate contacted the local child welfare agency to report mother had left her children alone overnight, since around 9:00 the previous morning. Her housemate stayed home from work that day because he didn't want to leave the children alone. He was instructed to contact local law enforcement and did so. At around 2:00 that afternoon, local sheriff deputies were dispatched to the home in response to his call. The housemate reported to law enforcement officials that he works full-time and usually is not home, and that on several prior occasions mother had left the children unattended for several hours.

Sheriff deputies reported that the children appeared to be in good health; the house was furnished and clean; the kitchen had adequate food, although they could not determine whether the children were properly eating

---

[1] All further dates are in that year.

meals; the children were clean; and "[n]o immediate danger in the home itself was present."

The sheriff deputies spoke to the two girls. The older daughter, S., lied about her and her brother's ages, claiming she was 13 (not 11) and that her brother was 10 (not 9). S. also said she is home schooled and that the last time was about two months ago. She refused to answer any other questions. The younger daughter, five-year-old I., said she hadn't spoken to her mother since the previous day and didn't know where she was.

One of the sheriff deputies also contacted and spoke with mother's sister, J.G., who declined to take custody of the children and reported that mother consistently leaves the children with strangers for days at a time.

One of the sheriff deputies left a message for mother who then returned his call. She said she was in Sacramento working and could not come back to take care of the children, told the officer it was none of his business when she was going to return to Vallejo and said she made arrangements with a niece to come get the children. Someone identifying herself as the unknown niece then called and said she would come from East Oakland to get the children after an appointment but did not say when, and she hung up before the sheriff deputy could get her contact information. After about an hour-and-a-half of waiting, the children were taken into temporary protective custody. Mother then contacted a sheriff's deputy to give her account of the situation; she reported that her housemate had agreed to watch her children but then changed his mind and contacted law enforcement after she refused his sexual advances.

According to the detention report, a social worker interviewed the three children and the housemate on the day the children were removed from the home (March 3) and interviewed mother the next day (March 4).

3

The older daughter, S., told the social worker she didn't know what mother does for work, and the family has moved around a lot for reasons she could not talk about. She said they had moved to Vallejo about two months ago and that the housemate sometimes takes care of them when mother is away. When mother left them the previous morning (March 2), mother told the children she was going to pick someone up but didn't say who or where or when she would return. Mother didn't leave them with a cell phone for emergencies, but S. said she could contact mother by email on her computer. She told the social worker that since their mother left, she had been in charge of cooking for her siblings and taking care of them. She said she made breakfast that morning but couldn't remember what they ate. S. also said her mother had left them at home multiple times. Mother instructed them to keep the doors locked, not to open the door to anyone or allow anyone inside the house; otherwise, mother told them, S. and her siblings would be taken away by CPS.[2] Repeating the lie she told a deputy sheriff, S. told the social worker that she's an adult even though she's only 13 years old and that she takes care of her siblings when their mother leaves them home alone. S. said she has an aunt named [D.] who lives close by but doesn't have a way of contacting her, and that mother doesn't have a good relationship with the rest of her family who live in Louisiana. S. also reported that she and her siblings were being homeschooled because mother said public school was too expensive.

Nine-year-old D. told the social worker the family had moved to California from Nevada two months ago, he didn't know his mother's

---

[2] At the detention hearing, the social worker testified S. would not reveal how often mother left her and her siblings at home, including overnight ("[S.] wouldn't tell me. She said she didn't want to tell me anything").

4

whereabouts since she left the prior day but that he can take care of himself because he's taking karate lessons.

Five-year-old I. also didn't know her mother's whereabouts since mother left the children the prior day, told the social worker she was hungry and couldn't remember what she had for breakfast.

The housemate reported to the social worker that mother had stopped working about two weeks after moving in, was behind on rent, and leaves the children unsupervised for hours at a time. He said she doesn't tell him when she leaves the house, she doesn't make childcare arrangements with him because she doesn't feel obligated to do so, and when he returns from work to find the children alone and without any food he cooks for them and makes sure they're safe until she returns. He reported that this was the first time she'd left them in his house overnight. He also said he thought mother has her children well-trained, because they stay locked up in their bedroom for hours and don't even come out to eat. He also said the children told him that when they lived in a motel, she would leave them overnight with no adult supervision for two or three days, and that the family members who had introduced him to mother (a sister and nephew in Albany) had told him she had been leaving the children unsupervised for years. He told the social worker mother had begun "acting up" when he asked for rent, and he expressed concern about her mental stability.

Mother told the social worker she couldn't recall how many times she'd left her children at home by themselves, didn't think she was breaking the law by doing so, and stated "there is no law against leaving minors at home unsupervised." She said S. was mature enough to take care of her siblings without adult supervision and said (incorrectly) that S. was 13 years old. She said she drives a delivery truck and was too tired to drive home from

Sacramento on the night of March 2. She said she usually leaves the children in the care of her housemate when she goes to work but that he called law enforcement because she declined to be in a romantic relationship with him. She also confirmed that she homeschools the children, using an informal curriculum of her own creation. Mother reported she was planning to move in temporarily with her sister-in-law D.B. in Berkeley, California and then move to a family rental property in Tracy, California. The social worker offered to get mother a childcare referral but mother declined, saying she didn't want a stranger taking care of her children.

Thereafter, on March 5, the Solano County Health and Social Services Department ("department") filed a dependency petition under Welfare and Institutions Code section 300 alleging mother placed the children at risk of serious physical harm as a result of her failure or inability to supervise or protect them.[3] The operative factual allegations (set forth in paragraph b-1) were as follows: "The minors, [S.] (13 years old; DOB: 05/03/2006), [D.] (10 years old; DOB: 12/24/2009), and [I.] (5 years old; DOB: [omitted]) are at substantial risk of suffering serious physical harm or illness, in that the mother, Sarah [B.], has a history of failing to provide adequate care and supervision whereby the children are left with an unrelated caregiver, without prior consent from the unrelated party or providing a phone number or location where she can be contacted for periods of up to five days. Such actions by the mother places [*sic*] the children, [S.], [D.] and [I.] at substantial risk of suffering serious physical harm or illness."

---

[3] All further statutory references are to the Welfare and Institutions Code.

6

The petition also contained allegations about the children's absentee fathers. It alleged the whereabouts of the fathers of the two girls were unknown, and the boy's father had had no contact with him for two years.[4]

After a contested detention hearing (held on March 6 and 9), the children were ordered detained. Among other subjects, mother disclosed details about her son's asthma. Pending further proceedings the court ordered the department to provide mother with parenting education, mental health services, a housing referral, and child care services, services the department had recommended as a means of avoiding the need for continuing the children in out-of-home care.

After the detention hearing, the department discovered through a records check that the two older children's ages were incorrect, and S. then admitted she had lied to police about her and her brother's ages to appear older so they would not be taken away.

Another social worker interviewed mother again after the detention hearing (on March 25). Mother adamantly denied leaving her children in other people's care for five days at a time. She was estranged from her sister J.G., who had communicated with local law enforcement on the day the children were taken into protective custody, and mother expressed strong negative views about her sister. She said that her housemate had agreed to look after the children on the day he contacted authorities, that she regularly made arrangements with him to care for them while she worked, and that sometimes her niece would care for the children too. She said the children were always told they could reach her by email, by going to a neighbor's house to use a phone, or to press "ring doorbell" to reach her. She reported

_____

[4] Eventually, the two younger children, D. and I., were placed with their fathers during the course of the case.

that previously, before she lived there, she used to drop her children off at the home of her best friend, J., who lived in South San Francisco, while she worked, sometimes overnight. Infrequently, she said she also used to get childcare from a nanny named Mandy, whose contact information she declined to provide.

Mother told the department she had been planning to move out of the home on Wednesday, March 4 (i.e., the day after her children were taken into custody), because her housemate had been making unwanted sexual advances toward her, he became aggressive when she resisted which made her feel unsafe, and she felt she had to leave. She had even completed a safety plan with La Casa Madres (presumably, a women's shelter) to help her get out and was planning to move to a brother's home in Tracy, California.

The jurisdiction report filed before the hearing (on March 26) described mother's March 25 interview and contained new details about mother's prior child welfare history. About 16 years earlier, in 2004, there had been three referrals for general neglect involving mother's two older (now college-aged) sons, none substantiated.[5]

While the jurisdiction hearing was trailing, the children were interviewed a second time by the department, on April 15.[6] When asked about the incident that led to the referral, D. said he was not alone all the time but only "a little bit," and that because [S.] is 13 years old (misstating

---

[5] One involved allegations the boys were not being properly supervised during weekends with mother, who left the boys with an aunt when she worked on weekends, and one of the boys was getting beat up. The allegations did not meet the criteria for an investigation and it was not pursued. The other two involved allegations of possible sexualized behavior by the boys; the allegations were found to be inconclusive and the only recommendation was therapy for the boys.

[6] Their interviews were reported in the May 29 disposition report.

her age), they were only alone for two to three hours. He disclosed that he and his sisters often stay at home alone but said that he is watched either by friends or by S.

S. and I. were interviewed together, by video conference due to the COVID-19 pandemic. Despite the social worker's requests, S. wouldn't allow I. to join the interview. S. shared some information about the family's struggles to find stable housing, and when asked why the family had moved so frequently she said, "How do I say this? We had trouble." Asked about the incident that led to the referral, S. said it was "not a big deal," that she hated the housemate for calling law enforcement simply because he did not see mother for "forty-eight (48) hours," and that he could have waited until it had been a week. The report also noted, "When asked who normally cares for them when [mother] is not available or working, [S.] did not want to answer the question and engaged with [I.] in play off the screen. When [S.] returned to the screen, she stated, 'Here is the thing, my mom went and did stuff, but I was at school.' When asked who cares for [I.] and [D.] when she was in school, [S.] stated she could not recall."

The disposition report prepared on May 29 described these follow-up interviews, as well as the agency's inability to evaluate mother's present circumstances. Mother had refused to engage with the agency, and the agency didn't even know where she was currently living. We discuss the latter subject in greater detail below.

The disposition report also discussed an interview with mother's estranged sister, J.G., who had allowed mother and the children to live with her three times, most recently about a year and half earlier (in December 2018). According to J.G., mother often left the children alone in the bedroom, and J.G. would not even know if the children were home until she heard

9

them.  Mother also would "sequester" herself and the children in the home and she would not allow the children to eat the food J.G. shared with them. One time, J.G. recalled, mother left the children alone past dinnertime and when J.G. encouraged them to come out of the bedroom to eat with her, they were apprehensive and said they could wait because mother had instructed them not to share her food.  She managed to feed them anyway, but mother was upset when she came home later and found out.  J.G. also reported that sometimes in the past, mother would show up at her home in the middle of the night alone and when J.G. asked where the children were, mother either would not answer or would say they were with a nanny.

J.G. also conveyed information she had been told by the Vallejo housemate who had reported mother to child welfare authorities:  that mother would often leave the children for two days at a time, forcing the housemate to ask neighbors to stay with the children because he didn't want to leave them alone when he went to work.  The housemate also told J.G. he was worried because there was no food for the children and so he had to feed them.

J.G. also reported that their own mother would often leave them home alone when mother was around nine years old (and J.G. was around 15), when their mother was dating the man to whom she eventually became re-married.

Another of mother's sisters, P.G., who had had significant contact with the children (the time period was not specified), reported they often went without enough food, were consistently dressed inappropriately for the weather and typically were "not doing well."  She also reported that when S. was an infant, her older brother J. (who was then five or six years old) was left alone with the baby and dropped her in the bathtub; S. was unharmed,

10

but when mother returned home she was furious and said J. had tried to kill S.

The May 29 disposition report assessed the safety risk of returning the children to mother as "high." The reasons were "[t]he number of prior neglect investigations," "one prior abuse investigation," mother's "unaddressed mental health concerns," her "lack of support systems and the family's isolation from others," and "[t]he Department's inability to engage [mother] and further assess her current living situation and circumstances." The department recommended all three children be adjudged dependents and that mother receive reunification services with respect to S. and D., but recommended terminating jurisdiction with regard to the younger daughter I. with an award of full physical custody to her father in Louisiana (and shared legal custody).

A contested combined jurisdiction/disposition hearing commenced on July 23, with concluding arguments and a ruling in the disposition hearing on July 29. By this point, mother's older daughter S. was in her third foster care placement (not including her emergency placement), D. had been moved from foster care to the home of his presumed father in Union City, California, and mother's younger daughter I. was on an extended home visit with her father in Louisiana, whose home had been assessed and approved as a potential placement. A social worker and mother were the only witnesses at the combined jurisdiction/disposition hearing. Their testimony is accurately summarized in the respondent's brief.

At the conclusion of the combined hearing, the court sustained the jurisdictional allegations, declared the children dependents and ordered them removed from mother's custody and ordered reunification services. I. was

11

placed with her father in Louisiana, D. was placed with his father in Union City, and S. was continued in foster care.

In taking jurisdiction, the juvenile court explained that, "There is corroborating evidence that the mother has left the minors unattended from both [housemate], [S.] and [mother's] sisters. There's various instances that are reported here." On the same date (July 23), the court signed written jurisdictional findings and orders.

The juvenile court explained the basis for its disposition ruling as follows: "[T]he evidence that comes in these cases is sometimes what's testified to in court, sometimes it's in the reports. There was evidence that I took from the reports regarding comments by your relatives about leaving the children alone and also by, frankly, the children's own statements, mostly [S.'s], about leaving them alone, which struck me as putting them at risk given their ages. The fact that they're not going to school, based on the description of your work requirements, I don't see how you can possibly be homeschooling them appropriately. And so that's the evidence that was presented to me that essentially persuaded me to rule as I did.

"It seems to me since you strike me as being an intelligent person that you could get through this process fairly quickly, but it's going to take a little bit of cooperation between you and the Department to work through this until the Court is going to be satisfied that your children are going to be safe, so that would be my suggestion to you."

Mother filed this appeal on July 29, after the juvenile court's oral rulings.

The court signed written dispositional findings and orders, entered on August 4 in S.'s case and on August 14 in her two siblings' cases.

We treat the notice of appeal as having been filed immediately after the juvenile court issued its written findings and orders. (See Cal. Rules of Court, rule 8.104(d)&(e).)

**DISCUSSION**

**I.**

*Jurisdiction*

Mother challenges the court's exercise of jurisdiction on two grounds. She contends the petition did not allege facts sufficient to support dependency jurisdiction under section 300. She also argues the evidence was insufficient to justify jurisdiction because there is no substantial evidence she placed her children at risk.

**A.     Sufficiency of the Petition**

A dependency petition must contain "A concise statement of facts, separately stated, to support the conclusion that the child upon whose behalf the petition is being brought is a person within the definition of each of the sections and subdivisions under which the proceedings are being instituted." (§ 332, subd. (f).) Here, the petition alleged dependency jurisdiction under subdivision (b) of section 300, which requires proof that "The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child . . . ."[7]

_____

[7] It also alleged jurisdiction under subdivision (g) of section 300, which applies when, among other circumstances, "a relative or other adult custodian with whom the child resides or has been left is unwilling or unable to provide care or support for the child, the whereabouts of the parent are unknown, and reasonable efforts to locate the parent have been unsuccessful." (§ 300, subd. (g).) However, we agree with mother that the department's allegations concerning the unknown whereabouts of the children's three fathers do not, standing alone, support the exercise of

13

Mother argues the petition does not sufficiently allege "how the children were left at any risk of physical harm, let alone serious physical and substantial risk thereof." She says the allegations "fail on their face due to absolutely no risk of physical harm to the children or lack of inappropriate care by mother."

It is unnecessary to address this contention. As the department argues, "If the jurisdictional findings are supported by substantial evidence, the adequacy of the petition is irrelevant. [Citation.] The only exception occurs when a parent claims a petition fails to provide actual notice of the factual allegations. Unless the alleged factual deficiencies result in a miscarriage of justice, the reversal of a jurisdictional order supported by substantial evidence is unwarranted." (*In re Javier G.* (2006) 137 Cal.App.4th 453, 458-459.) The department points out mother's opening brief "does not raise the exception, lack of actual notice of the factual allegations." She argues only that the petition's allegations "fail on their face due to absolutely no risk of physical harm to the children or lack of inappropriate care by mother." Therefore, mother's facial challenge to the petition is irrelevant if, as we next conclude, the court's jurisdictional findings are supported by substantial evidence.[8]

_____

jurisdiction. Simply put, the fact a child has one absentee parent is not a basis for dependency jurisdiction. (See *In re Anthony G.* (2011) 194 Cal.App.4th 1060, 1065-1066; *In re Janet T.* (2001) 93 Cal.App.4th 377, 392 (*Janet T.*).) Accordingly, our analysis focuses solely on the assertion of jurisdiction under subdivision (b) of section 300.

[8] Mother argues in her opening brief the petition's allegations are "vague and remote on time, and fail[] to specify for how long mother leaves the children with an unrelated adult so that the court could determine if that length of time places the children at serious risk of substantial physical harm." But that is not a claim of inadequate notice. (See, e.g., *In re Javier G., supra,* 137 Cal.App.4th at p. 459 [reviewing jurisdictional order

14

In her reply brief, mother argues for the first time that the petition did not give her adequate notice of the department's claims against her. Specifically, she argues that the petition's reference to her " 'history' and some unidentified time frame . . . does not give a parent adequate notice as to how to defend against such blur of allegations of her generally legal conduct—that is[,] leaving her children with an adult or even alone" so that she can go to work. This point is forfeited, however, because it was not asserted in the opening brief. (See *People v. Morales* (2020) 10 Cal.5th 76, 98; *People v. Maxwell* (2020) 58 Cal.App.5th 546, 557, fn. 4.)

Even if the point were not forfeited, we would reject it under the very case that mother cites, which held a parent's challenge to the sufficiency of the petition was moot. (*In re John M.* (2012) 212 Cal.App.4th 1117, 1123 (*John M.*).) The appellate court explained: "by the time of the hearing the petition was accompanied by several DCFS reports. Under these circumstances, mother cannot argue she had prejudicially inadequate notice of the allegations against her. [Citation.] We conclude below that substantial evidence supported the juvenile court's assertion of jurisdiction. Thus, we need not consider mother's argument that the petition was facially insufficient." (*Id.* at pp. 1123-1124.) For the same reason, neither must we.

Further, the petition *did* give mother "sufficient notice of the specific facts on which the dependency petition was based to enable [her] to respond to its allegations." (*In re T.V.* (2013) 217 Cal.App.4th 126, 132.) It alleged she had "a *history* of failing to provide adequate care and supervision" by leaving the children "with an unrelated caregiver, without prior consent from

---

only for substantial evidence, because mother's argument the petition was " 'poorly and inadequately worded' " is not a claim she received inadequate notice of its allegations].)

15

the unrelated party or providing a phone number or location where she can be contacted for periods of up to five days" (italics added), and that "[s]uch actions" placed the children at substantial risk of suffering serious physical harm or illness. The allegations were not limited to the single occasion that prompted her housemate to contact child welfare authorities but, rather, "can be read broadly to show that the type of . . . conduct in which [mother] engaged on that date" put the children at substantial risk of physical harm or illness, and thus "specif[ied] parental conduct that contributed to the need for protection." (*In re T.V.,* at p. 132 [rejecting facial challenge to sufficiency of dependency petition alleging parents "periodically" exposed child to violent confrontations, and alleged specific facts concerning one incident when child was not present].) In sum, mother cannot have been surprised to litigate the basic issue that brought her to the attention of the dependency court, which is whether she had a history of leaving her children unattended repeatedly and for such long periods of time that it placed them at substantial risk of serious injury or illness.

We now turn to the adequacy of the evidence to sustain jurisdiction on that basis.[9]

---

[9] Our focus in this analysis is on mother's conduct in leaving her children unattended. Although the department became concerned over the course of its investigation with the children's lack of schooling and the juvenile court also noted concerns about this in its dispositional ruling, that was not the basis of the petition. "We cannot affirm a jurisdictional finding that was never alleged . . . in the trial court." (*In re V.M.* (2010) 191 Cal.App.4th 245, 253.)

## C.     Jurisdictional Findings

As noted, mother argues the evidence was insufficient to sustain a finding the children were placed at substantial risk of serious physical harm or illness under section 300, subdivision (b).

Mother has not summarized any evidence from the combined jurisdiction and disposition hearing, which encompasses approximately 100 pages of reporter's transcript, an 18-page detention report, a 22-page jurisdiction report, and a 68-page disposition report.  In the argument section of her brief, she merely discusses isolated portions of the evidence that favor her position regarding jurisdiction.  By presenting an incomplete and one-sided treatment of the record, mother has forfeited her challenge to the sufficiency of the evidence.  An appellant who challenges the sufficiency of the evidence must set forth " 'all material evidence on the point . . . and not merely their own evidence.  [Citation.]  Failure to do so amounts to waiver of the alleged error and we may presume that the record contains evidence to sustain every finding of fact.' " (*Toigo v. Town of Ross* (1998) 70 Cal.App.4th 309, 317 [argument deemed forfeited]; accord, *Benson v. Kwikset Corp.* (2007) 152 Cal.App.4th 1254, 1273 [same].)  Although it is therefore appropriate to reject mother's conclusory challenge to the sufficiency of the evidence without discussion, we will briefly address the evidence supporting the court's jurisdictional findings.  (*Toigo*, at p. 317.)

" 'In reviewing the jurisdictional findings and the disposition, we look to see if substantial evidence, contradicted or uncontradicted, supports them.  [Citation.]  In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the

province of the trial court.' " (*In re R.T.* (2017) 3 Cal.5th 622, 633 (*R.T.*).) Moreover, "we consider the entire record to determine whether substantial evidence supports the juvenile court's findings . . . and affirm the order even if other evidence supports a contrary finding. [Citations.] The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or order." (*In re T.V.*, *supra*, 217 Cal.App.4th at p. 133.)

Here, there is substantial evidence mother regularly left her children unsupervised without adult supervision for long periods, including sometimes overnight. Although mother maintained she had an arrangement with her housemate to care for the children on the night she left them alone, the housemate disputed that, and even S. told the social worker that *she* was the one who was caring for her younger siblings on that occasion. Although the children and the home were clean and orderly, the younger daughter I. was hungry and couldn't remember eating breakfast that day. And this was not an isolated occurrence. Mother's sister J.G. described mother leaving the children alone in her home when they lived with her, and mother showing up unannounced in the middle of the night on other occasions refusing to say who was looking after the children. The children told the housemate that mother left them alone for several days in a motel room when they lived in Nevada. The housemate told J.G. mother would leave the children alone for two days at a time, forcing him to ask neighbors to help out. S. essentially clammed up when asked (by a social worker, in her April 15 interview) who normally cares for the children when mother is unavailable or working. The juvenile court could infer from the statement by the little boy D. that he can take care of himself because he's taking karate lessons that he was accustomed to doing so; and, indeed, D. disclosed in his April 15 interview

18

that the children often were left home alone without adult supervision. And perhaps most telling, S. told a social worker the housemate should have waited *a week* before calling law enforcement, not "forty-eight hours," from which the court could reasonably infer she was accustomed to being left alone for *periods exceeding two days*.

Moreover, the juvenile court could reasonably infer that mother and her older daughter S. were not forthcoming about the true extent of mother's lax supervision *and* that they actively sought to conceal it. Both mother and S. lied to the department (and police) about the children's ages. And both mother and S. were quite secretive about their family life and exhibited an extreme distrust of child welfare authorities. For example, S. had been instructed to keep all doors locked and not let anyone into the home to avoid CPS involvement. A social worker testified S. wasn't comfortable in therapy for fear of revealing information that might result in a mandated report by her therapist, and mother herself didn't want any therapy, testifying at the hearing she didn't need any more therapy. Mother herself was resistant to both law enforcement and child welfare officials during the initial investigation; she even refused the department's offer of a childcare referral. All of these efforts to resist investigation and refuse assistance could reasonably give the juvenile court cause for concern over the children's safety. (See *In re E.E.* (2020) 49 Cal.App.5th 195, 213-216 [substantial evidence supports jurisdictional finding that children were at risk of suffering serious harm from neglect because mother was "evasive and resisted investigation and help" from child welfare authorities].)

Given this substantial evidence of chronic parental neglect, the juvenile court also could reasonably infer a risk of serious physical harm or illness to the children. This case is similar to *In re K.B.* (2021) 59 Cal.App.5th 593

19

(*K.B.*), which affirmed the assertion of dependency jurisdiction over three older children (ages 14, 10 and 7) who were regularly left unsupervised in their parents' home (in that case, because their parents were abusing drugs and alcohol), and it also affirmed the children's removal from parental custody.[10]  In holding that sufficient evidence supported a finding that mother's neglect of her children put them at substantial risk of serious physical harm, the appellate court explained:  "The mother routinely disappeared from her children's lives at about 5:00 p.m. until they woke her the next morning for school. . . .  The resulting failure to supervise the children put them at serious risk.  Without supervision, nothing protects children from a world of serious and sudden danger." (*K.B.*, at pp. 600-601.) It went on:  "[S]ufficient evidence shows [mother] created a serious risk of physical harm to her children.  She left them unsupervised most of the time they were home.  Children are immature, inquisitive, clever about escaping, and inexperienced with life's hazards.  With impulsive urges and without much judgment about what could go wrong, children need supervision.  A speeding car, a fire, a fall, a predator:  disasters can strike swiftly and without warning. [¶] The juvenile court fairly could infer the mother left her children largely unsupervised every evening.  The mother goes to bed or becomes unavailable each evening around 5:00 p.m.  The father similarly is asleep or in his room for most of the time he is at home.  The only other adult in the household, the maternal grandfather, does not return from work until

---

[10]  Although the lack of supervision in *K.B.* was due to parental drug abuse whereas in this case mother left her children unsupervised in order to work, that distinction is immaterial.  "[T]he first clause of section 300[, subdivision] (b)(1) authorizes dependency jurisdiction without a finding that a parent is at fault or blameworthy for her failure or inability to supervise or protect her child." (*R.T.*, *supra*, 3 Cal.5th at p. 624.)

night time. . . . [¶] The court need not wait for disaster to strike before asserting jurisdiction.  [Citation.]  This is why the statute uses the word 'risk.' " (*K.B.*, at pp. 602-603.)

Furthermore, the fact that a grandfather lived with the family did not ameliorate the risk.  The appellate court held the juvenile court could infer that the grandfather's help would not supply adequate supervision for the children, because he claimed to be unaware of the parents' drug use, and he worked all day and was only home at night.  (*K.B., supra,* 59 Cal.App.5th at pp. 605-606.)

This case is practically on all fours with *K.B.*  Like the live-in grandfather in that case, the juvenile court could infer mother's housemate could not safely supervise the children at all times because he worked all day (and only reluctantly stayed home from work on one occasion to look after them).  And although in some ways, the extent of risk involved in *K.B.* was greater because the children were abandoned every night (due to parental drug abuse) whereas this case involves less regular periods of neglect, in some ways the extent of risk involved in *K.B.* was less serious.  Here there is substantial evidence mother has left her children unattended for *days at a time*, which was not true in *K.B.*  Moreover, these children are younger than the children in *K.B.* and therefore even less inherently capable of caring for themselves, guarding against perils and dealing with emergencies:  by the time of the contested hearing, S. was only twelve years old, D. was nine and I. was five.  And one of them, D., has a serious medical condition that has required emergency hospital care.  Risk is risk, and, "The court need not wait for disaster to strike before asserting jurisdiction." (*K.B., supra,* 59 Cal.App.5th at p. 603.)

21

Moreover, in evaluating the risk that mother's behavior posed, the juvenile court could properly consider mother's attitude. Her "comments and conduct offered no indication that this was a unique situation or that mother was unlikely to engage in similar behavior in the future," because for the most part she did not even acknowledge that leaving her children unattended was problematic. (See *John M.*, *supra*, 212 Cal.App.4th at pp. 1124-1125 [upholding jurisdictional finding of risk].)

We recognize mother's two older children, particularly S., present themselves as fiercely self-reliant, a characteristic one can reasonably infer results, sadly, at least in part from mother's chronic neglect of them. But the children's willingness to take care of themselves, by necessity, does not mean they are not at serious risk when left all alone for long periods of time. Compounding the safety risk, moreover, is the children's disinclination to seek any help from adults when left alone; S. has been taught literally to keep herself and her siblings behind locked doors that close them off from the outside world. And the two adults who have shared their homes with the family at different times (mother's sister J.G. and mother's Vallejo housemate) told consistent accounts of the children refusing food and care from others, sequestering themselves in their bedroom, and generally keeping to themselves. (Cf., *In re Rocco M.* (1991) 1 Cal.App.4th 814, 825-825 [questioning whether substantial evidence supported finding of substantial risk of physical danger to 11-year-old boy left unsupervised by mother who "proved that he could take care of himself, at least physically, on these occasions, generally by placing himself under the care of other adults, including a grandmother and an uncle," but not deciding the issue], disapproved on another ground in *R.T.*, *supra*, 3 Cal.5th at p. 629].)

In arguing the evidence was insufficient to sustain the exercise of jurisdiction, mother takes no account of the circumstances we have discussed and, moreover, rests her position on the erroneous contention that S. was 13 years old (she was 11 when the incident leading to the detention occurred and had just turned 12 by the time of the hearing). Mother also views the evidence in the light most favorable to *her*, which disregards our standard of review (for example, she implies the housemate had consented to watch her children overnight and argues he then had a "change of heart" because she had rejected his sexual advances). She also argues that her conduct in leaving the children home without an adult was a "curable" problem, akin to a temporary case of head lice (which does not constitute serious physical injury or illness within the meaning of section 300, subdivision (b) (see *Janet T.*, *supra*, 93 Cal.App.4th at p. 390)). We cannot accept that analogy. There is simply no comparison between parenting practices that leave a child potentially vulnerable to contracting a minor, treatable condition that is "a common affliction of children everywhere" (*ibid.*) and persistent, habitual neglect that leaves children potentially vulnerable to the full panoply of harm that could befall them when left unattended on a regular basis, including overnight and sometimes for days at a time.

For these reasons, substantial evidence supports the court's finding the children were at substantial risk of serious physical harm or illness.

## II.

### *Disposition*

As relevant here, section 361 provides that a child who has been declared a dependent of the juvenile court "shall not be taken from the physical custody of his or her parents . . . unless the juvenile court finds clear and convincing evidence of any of the following circumstances listed in

23

paragraphs (1) to (5), inclusive . . . : [¶] (1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c).)  The statute also directs the juvenile court to "make a determination as to whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from his or her home" and to "state the facts on which the decision to remove the minor is based."  (§ 361, subd. (e); see also Cal. Rules of Court, rule 5.690(a)(1)(B)(i) [disposition report must include "A discussion of the reasonable efforts made to prevent or eliminate removal"].)

Here, mother argues that the children were erroneously removed from her custody at disposition, both because the court made errors of law under section 361 and because the evidence was insufficient.

We conclude the removal order was proper.

### A.     Claimed Errors of Law

Mother argues, first, the juvenile court "made a misstatement of law and appeared to misunderstand the legal standard required to remove a child from a custodial parent under section 361."  She contends the court did this in two ways:  by making statements at the hearing in its oral ruling that she contends reflects its misunderstanding of the applicable legal standard, and also by failing to "state the facts" supporting its conclusions as required by section 361.

Turning first to mother's argument the court misunderstood the law, our initial difficulty is that mother's counsel at no time objected that the juvenile court misapplied or misunderstood the applicable legal standard

24

under section 361.  " 'A party forfeits the right to claim error as grounds for reversal on appeal when he or she fails to raise the objection in the trial court.  [Citations.]  Forfeiture, also referred to as "waiver," applies in juvenile dependency litigation and is intended to prevent a party from standing by silently until the conclusion of the proceedings.' "  (*In re N.O.* (2019) 31 Cal.App.5th 899, 935.)

Even if this issue had been preserved, moreover, mother cites no authority authorizing this court to review the juvenile court's *oral comments at the hearing* for legal error, as opposed to reviewing the correctness of the orders that it issued.  Ordinarily, we may not do so.  "A judgment or order will not be reversed simply because the trial court's oral comments from the bench . . . indicate the decision was based on a misunderstanding or misapplication of the law.  Even if the record demonstrates the trial judge's legal reasoning was unsound, the ruling will be affirmed so long as it can be supported by *any* legal theory."  (Eisenberg et al., Cal. Practice Guide:  Civil Appeals & Writs (The Rutter Group 2020) ¶ 8:215.)  This principle applies equally to dependency cases.  " 'We uphold judgments if they are correct for any reason, "regardless of the correctness of the grounds upon which the court reached its conclusion."  [Citation.]  "It is judicial action and not judicial reasoning which is the subject of review . . . ." ' "  (*In re Jonathan B.* (1992) 5 Cal.App.4th 873, 876.)  The authority mother cites did not involve a claim the court's oral comments from the bench reflected the commission of legal error, but simply a contention the juvenile court applied the wrong statute when it terminated dependency jurisdiction (section 364 rather than section 391).  (*In re Shannon M.* (2013) 221 Cal.App.4th 282, 285, 288.)  The governing legal standard was a disputed issue in the juvenile court (*id.* at

p. 290) and the appellate court simply resolved that legal question on appeal. (*Id*. at p. 285.)

Finally, and in all events, the juvenile court did not misunderstand the legal standard. Although some of its initial comments articulated the legal standard inaptly, counsel interjected and alerted the court to its misstatements and the juvenile court then correctly stated the legal standard as to all three children.[11] Although its oral comments could have been more clear, it expressly applied the clear and convincing evidence standard in its oral ruling and expressly referenced section 361, subdivision (c)(1). In addition, as the department notes, it signed findings and orders as to all three children stating that there was clear and convincing evidence of the circumstances stated in section 361, subdivision (c)(1).

---

[11] First addressing the younger daughter, I., the juvenile court initially said it was finding by clear and convincing evidence that "returning the minor to child [*sic*] is not warranted," but then, at the request of the department's counsel, it confirmed that it was finding by clear and convincing evidence that return to the mother would place the minor at substantial risk ("Yeah, I was looking for the term of art and then I lost my train of thought. That's what I'm finding"). Later, after some discussion about visitation, it again made a finding that "by clear and convincing evidence, as stated in [section] 361[, subdivision] (c)(1), that return of [I.] presents a danger to the child's physical or emotional well-being," following which counsel then waived reading of the court's actual orders.

Next, addressing D., it initially said it was finding "by clear and convincing evidence the return to the mother is not in the minor's interest" and "will create the possibility of emotional or physical harm." But when the department's counsel again interjected and asked if the court was finding that there's a substantial risk of physical or emotional harm, the juvenile court confirmed that it was. Again, all counsel waived reading of the orders as to D.

Finally, as to S., it found that "there's clear and convincing evidence as stated in [section] 361 and that the minor needs to be detained from the mother."

26

We also reject mother's second legal contention—that the court erred by failing to "state the facts on which the decision to remove the minor is based" as required by section 361, subdivision (d). In the first place, she asserts this error without elaboration or discussion, which is insufficient to demonstrate error. (See *In re A.C.* (2017) 13 Cal.App.5th 661, 672 ["If an argument in an appellate brief is supported by only an opinion or argument of appellant's counsel without 'citation to any recognized legal authority,' that argument may be deemed waived for failure to present supporting substantive legal analysis"].) Furthermore, the court *did* state the factual basis for its decision, in a portion of the hearing transcript mother does not acknowledge that we have quoted above. Indeed, the court did this after mother's counsel specifically asked the court to explain the basis for its ruling. She fails to argue or demonstrate that those remarks were not sufficient to comply with section 361's directive. Moreover, when the juvenile court concluded its remarks, mother's counsel did not object that the court's explanation was insufficient under section 361 or required anything further. In these circumstances, not only has mother failed to demonstrate error but any objection to the adequacy of the court's explanation was forfeited. (See *In re N.O., supra,* 31 Cal.App.5th at p. 935.) Finally, and as the department notes, any error also was harmless, because the disposition order was amply supported by the evidence. (See *In re Jason L.* (1990) 222 Cal.App.3d 1206, 1218-1219 [juvenile court's failure to state facts supporting its removal order and to determine whether reasonable preventative efforts had been made held harmless where dispositional order was supported by clear and convincing evidence].) We now turn to that subject.

## B.    Sufficiency of the Evidence

Mother contends the evidence was insufficient to remove the children from her custody, for two reasons.  One, there was no clear and convincing evidence of substantial danger if the children were left in her care.  And second, she contends the department did not make reasonable efforts to prevent the children's removal, and so it was not shown that there were "no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody" as required by subdivision (c) of section 361.

### 1.    Evidence of Substantial Danger

We may readily reject mother's first contention.  She asserts in a single sentence, without any discussion of the record or citation to legal authority, that "there was no clear and convincing evidence of substantial danger if the children remained in mother's physical custody."  That is insufficient to demonstrate error.  "We may and do 'disregard conclusory arguments that are not supported by pertinent legal authority or fail to disclose the reasoning by which the appellant reached the conclusions he wants us to adopt.' " (*United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 153; see also *id*. at p. 156 [appellant "has failed to adequately support these claims with cogent argument or appropriate legal or factual citations. Accordingly, they are forfeited"]; *In re A.C.*, *supra,* 13 Cal.App.5th at p. 672.) The point is not even captioned under a separate argument heading as required by California Rules of Court, rule 8.204.  (See *United Grand Corp*. at p. 153.)

Although it is not our job to " 'perform an unassisted study of the record or a review of the law relevant to a party's contentions on appeal' " (*In re Tobacco Cases II* (2015) 240 Cal.App.4th 779, 808), we will briefly comment

28

on the evidence because even if the point were not forfeited we would conclude the evidence was sufficient.

The burden of proving the need to remove a child from parental custody is higher than the burden of establishing dependency jurisdiction. As recently summarized by one appellate court:

" 'Maintenance of the familial bond between children and parents—even imperfect or separated parents—comports with our highest values and usually best serves the interests of parents, children, family, and community. Because we so abhor the involuntary separation of parent and child, the state may disturb an existing parent-child relationship only for strong reasons and subject to careful procedures.' [Citation.]

"Accordingly, ' "[i]n dependency proceedings[,] the burden of proof is substantially greater at the dispositional phase than it is at the jurisdictional phase if the minor is to be removed from his or her home" ' or the physical custody of a parent. [Citation.] The applicable statute, section 361, subdivision (c), " ' "is clear and specific: Even though children may be dependents of the juvenile court, they shall not be removed . . . unless there is clear and convincing evidence of a substantial danger to the child's physical health, safety, protection, or physical or emotional well-being *and* there are no 'reasonable means' by which the child can be protected without removal." ' [Citations.] [¶] . . . [T]he juvenile court must determine whether a child will be in substantial danger if permitted to remain in the parent's physical custody, considering not only the parent's past conduct, but also current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention." (*In re I.R.* (2021) 61 Cal.App.5th 510, 519-520.)

Moreover, " 'On appeal from a dispositional order removing a child from a parent we apply the substantial evidence standard of review, keeping in

29

mind that the trial court was required to make its order based on the higher standard of clear and convincing evidence.' " (*In re I.R.*, *supra*, 61 Cal.App.5th at p. 520.) "When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable factfinder could have found it highly probable that the fact was true. In conducting its review, the court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011-1012.)

Despite the higher burden involved at this stage of proceedings, viewing this record in the light most favorable to the department, the record as a whole contains substantial evidence from which the juvenile court could find it highly probable there was a substantial danger to the children's "physical health, safety, protection, or physical or emotional well-being" if they were left in mother's custody.

Mother's younger daughter, I., was only five years old at the time of the dispositional hearing, and her asthmatic brother D., only nine. The juvenile court could find it highly probable there was substantial danger to these two younger children if they were left in mother's custody, because it was highly probable mother would continue to leave them with no adult supervision for extended periods of time. One was young and clearly incapable of caring for herself. And the other, who was a few years older, had a serious, and indeed potentially life-threatening, medical condition that could require a trip to the hospital on a moment's notice, at any time of day or night. " ' "The parent

30

need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child." ' [Citation.] The court may consider a parent's past conduct as well as present circumstances.' " (*John M.*, *supra*, 212 Cal.App.4th at p. 1126 [affirming removal order].) Here, "The juvenile court could infer these were recurring problems, and nothing in mother's situation had changed to suggest that they would not continue in the future," and furthermore "there was no indication mother ever acknowledged any problem with her leaving" her children unattended. (*Id.* at pp. 1126–1127.)

Although 12-year-old S. is not as immature as her siblings, here too we are satisfied the removal order has sufficient support in the evidence. Two factors, alone and in combination, demonstrate why that is so.

First, S., like her siblings, has been left alone for days at a time, including overnight. *K.B., supra*, 59 Cal.App.5th 593, the decision we have discussed that upheld the exercise of jurisdiction over three older children (ages 14, 10 and 7) whose parental drug abuse left them unsupervised on a nightly basis, is again instructive. The appellate court held that the same evidence that justified the juvenile court in taking jurisdiction in that case also supported the children's removal from parental custody under the clear and convincing evidence standard imposed by section 361. (See *K.B.*, at p. 605.) Having already discussed the similarities of that case, we reach the same conclusion. We acknowledge there may be circumstances in which leaving a young adolescent such as S. unsupervised for a brief period of time would not pose an undue risk to the minor's safety, but that is not this case.

Second, S.'s risk of suffering serious physical injury is exacerbated because she has regularly been left with responsibility to care for her two younger siblings, one of whom is very young and the other has a serious

medical condition. For example, the more frequent her responsibilities for preparing meals for them and trying to ensure they stay fed, the greater the risk of kitchen accidents. And with no adult there to judge the necessity of a call to 911, or to staunch the bleeding or to drive or get on a bus to seek immediate medical care, the more potentially serious is any household accident. Living for days at a time without adult supervision as she does, S. is just one slip of a kitchen knife, one broken glass, or one sharp soup can lid away from serious peril. S.'s caretaking responsibilities also put her at serious physical risk because if harm befell either of the two younger children (either by accident or, in D.'s case, because of a medical emergency) and S. were to panic, there is an infinite variety of scenarios in which S. might be seriously physically injured while panicking over one of her younger siblings.

Moreover, " 'The trial court is in the best position to determine the degree to which a child is at risk based on an assessment of all the relevant factors in each case.' " (*In re E.E.*, *supra,* 49 Cal.App.5th at p. 217.) Here, again, mother's resistance to any help or intervention throughout the course of these proceedings, her dishonesty about S.'s age and her refusal to engage at all with the agency were all additional cause for serious concern, including with respect to 12-year-old S. (See *ibid.* [affirming order removing children from parental custody where parents "did not cooperate with the social worker or engage meaningfully in services," were "emphatically resistant to the agency's investigation" and whose "resistant behavior and lack of progress in services reflect a desire to avoid investigation . . . and a lack of insight into the serious problems" posed by their conduct].) Moreover, there is substantial evidence the children were sometimes left without adequate food. Mother instructed the children not to eat food that other adults shared with them, and the younger daughter I. was hungry the day the children

were taken into protective custody. Leaving a minor alone for several days without adequate food poses a substantial risk of danger to their physical health, including an adolescent 12 year old.

In short, we find no error in the court's finding by clear and convincing evidence that mother posed a substantial danger to her children.

### 2. Evidence of Reasonable Efforts to Prevent Removal and Consideration of Alternatives to Removal

As noted, the juvenile court may not remove a child from parental custody unless "there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody" (§ 361, subd. (c)(1)), and the juvenile court must "make a determination as to whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from his or her home" and to "state the facts on which the decision to remove the minor is based." (*Id.*, subd. (e).)

Citing *In re Ashly F.* (2014) 225 Cal.App.4th 803, mother contends that reasonable means of protecting the children did exist that should at least have been considered, including unannounced home visits, public health nursing services, in-home counseling services, shelter and childcare assistance. Or, mother says she could have moved to the home of a family friend. She contends that "both the Department and the court plainly failed to explore alternatives to removal based on current information" as of the time of the disposition hearing. Accordingly, she contends, the evidence was insufficient to support the removal order.

*Ashly F.* does not compel reversal. The appellate court in that case reversed a removal order, but the record contained *no* evidence of reasonable efforts by the agency to prevent removal. In its reports, the agency merely regurgitated the statutory language in conclusory fashion without describing

its efforts or the alternatives it had considered or rejected. (*Ashly F.*, *supra*, 225 Cal.App.4th at p. 809.) Moreover, unlike here, both parents exhibited a genuine desire to redress their parenting problems.[12] In these circumstances, *Ashly F.* held that the removal order was not supported by substantial evidence. (*Id.* at p. 811.) Here, by contrast, the department documented its repeated efforts to help mother, and it was *mother* who consistently rebuffed them.

The department's efforts began on March 4, the day the children were taken into protective custody, when the department offered to provide mother with a childcare referral and she refused, "stating that she does not want strangers taking care of her kids."

The detention report recommended a number of steps to facilitate the return of the children to mother's custody, including childcare services, housing referrals, case management services and "mental health," and the court ordered the department to provide them.

After that, the May 29 disposition report speaks for itself:

"Since the writing of the Jurisdiction Report, the Department has attempted to engage the mother, [S.B.]. [Mother] was invited and significantly encouraged to participate in a Child Family Team Meeting on April 23, 2020. [Mother] declined to participate in a Child Family Team

---

[12] The mother had expressed remorse for her conduct and was enrolled in a parenting class, and the father had already completed one. (See *Ashly F.*, *supra*, 225 Cal.App.4th at p. 810; *In re V.L.* (2020) 54 Cal.App.5th 147, 158 [distinguishing *Ashly F.*].) Here, by contrast, mother consistently denied that she had engaged in dangerous parenting practices, and indeed she opposed all reunification services (except for visitation) including parenting classes and therapy. "[S]he is not in the same shoes" as the parents in *Ashly F.* (*In re V.L.*, at p. 158; see also *John M.*, *supra*, 212 Cal.App.4th at p. 1127 [affirming removal order where, inter alia, mother never acknowledged any problem with leaving son unattended].)

Meeting stating she did not believe it was appropriate for the meeting to occur virtually due to COVID-19 worries. [Mother] was informed she could attend via telephone, not video chat, and continued to decline to participate.

"On May 6, 2020, the undersigned contacted [mother] via text message to schedule a telephone interview. [Mother] refused to communicate with the undersigned via text message again stating it was not appropriate and requested the undersigned contact her via e-mail or telephone. On May 6, 2020, the undersigned e-mailed [mother] and provided general times on May 7, 2020 and May 8, 2020 to schedule a telephone appointment. [Mother] responded to the email by stating: [¶] 'You'll need to be more specific. Time wise and what is this phone call is all about? It's been two weeks of trying to reach you. Please stop calling my family and associates speaking on my behalf. Magie, you do not represent me or my children's interests. We have attorneys for that. If you are to say to someone that I said something it had better be signed by me. Not your interpretation of events like all of you have been. Stick to the facts. Hold yourself to the law and its integrity. Thank you.'

"The undersigned clarified the intention of the interview, provided more specific times, and reiterated the undersigned's desk phone and cell phone numbers. It should be noted the undersigned had not received any missed calls, text messages, or e-mails from [mother] in the two (2) weeks prior.

"On May 7, 2020, the undersigned again reached out to [mother] to schedule an appointment and provided her with referrals for parenting education and mental health services via e-mail. The undersigned also shared the Department could assist with housing resources, but the undersigned needed more information to determine what referral was most

appropriate.  At the time of this writing [May 29, 2020], the undersigned has yet to receive a return response from [mother]."

At the contested hearing conducted two months later, the social worker confirmed some of these details and provided updated information.  By then, mother had simply provided a new address in Southern California, but the social worker still had not been able to speak with mother and thus could not assess mother's current living situation or whether mother was able to make appropriate childcare arrangements.  The social worker also testified that earlier that very week mother had refused to participate in a child and family team meeting for S. and insisted that the meeting be canceled.  Mother herself testified that she now lived in *Oakland* and had just put down a deposit on a new apartment there, and admitted she had not given her new address to the social worker or had her new housing situation assessed (though she now professed willingness to have that occur).

In light of all of this evidence, none of which mother's appellate brief discusses, mother's contention the department and the juvenile court did not fulfill their statutory duty to explore preventative alternatives to continuing the children in out-of-home placements at the time of disposition borders on frivolous.  The department clearly attempted to consider alternatives, and mother herself prevented any serious pursuit of them.  (See, e.g., *In re G.C.* (2020) 48 Cal.App.5th 257, 265-266 ["ample" evidence supports removal order despite alternatives juvenile court "could have" pursued, given mother's failure to complete family maintenance services in prior case and her "history of avoiding contact with social workers"].)

What is more, even had mother been more willing to communicate with her social worker, the juvenile court could reasonably doubt that mother would abide by preventive measures designed to protect the children if they

36

were returned to her custody, or cooperate with supportive in-home services. For example, there was uncontradicted evidence that mother and S. had regular unsupervised contact, which both violated the juvenile court's orders *and* disrupted S.'s fourth placement in foster care. And mother was obstructionist in other ways as well. She interfered with a potential relative placement, telling the children she did not want the children to live with their aunt who was under consideration as a potential caregiver or have any visitation with her. She encouraged S. to be secretive in therapy and eventually she even managed to persuade the child to fire her therapist. In these circumstances, in light of the entire record, "the juvenile court could reasonably determine [the children] could not be safely placed in mother's custody in the hope that she would comply with court orders or [the department's] supervision." (*John M.*, *supra,* 212 Cal.App.4th at p. 1127.)

## DISPOSITION

The judgment is affirmed.

_____
STEWART, J.

We concur.

_____
KLINE, P.J.

_____
RICHMAN, J.

*In re S.B.* (A160627)